1   Lynn Lincoln Sarko
    **KELLER ROHRBACK, L.L.P.**
2   1201 Third Avenue, Suite 3200
    Seattle, WA  98101-3052
3
    Jane B. Stranch
4   **BRANSTETTER, KILGORE, STRANCH & JENNINGS**
    227 Second Avenue, North, 4th Floor
5   Nashville, Tennessee  37201-1631

6   *Co-Lead Counsel for ERISA Plaintiffs*

7   Ronald Lovitt or Thomas Hannan
    **LOVITT & HANNAN, INC.**
8   900 Front Street, Suite 300
    San Francisco, CA  94111
9
    Robert A. Goodin or Wayne T. Lamprey
10  **GOODIN, MACBRIDE, SQUERI, RITCHIE & DAY, LLP**
    505 Sansome Street, 9th Floor
11  San Francisco, California  94111

12  *Co-Liaison Counsel for ERISA Plaintiffs*

13

14              UNITED STATES DISTRICT COURT
              NORTHERN DISTRICT OF CALIFORNIA
15               SAN FRANCISCO DIVISION

16                                    )
    In re PROVIDIAN FINANCIAL CORP.   )   Master File No. C 01-5027 CRB
17  ERISA LITIGATION,                 )
                                      )   CONSOLIDATED CLASS ACTION
18                                    )   ERISA COMPLAINT[1]
    _____  )
19  *This Document Relates to*:       )
    ALL ACTIONS                       )
20                                    )
                                      )
21  _____  )

22

23  _____

24  [1] The Named Plaintiffs in this action are: Ruth Spindler, Philip Edwards, Joseph Wong, David Michael Peters,
    Christian Sommer, Cynthia Boyajian, Fred Williams, Jeannie Lowery, Veronica Melton, and Ramon Holmes. The
25  Defendants are: Providian Financial Corporation, John Does Nos. 1-100 (members of the Advisory Committee(s)
    of the Plan), Shailesh J. Mehta, David R. Alvarez, David J. Petrini, James Rowe, J. David Grissom, Leonard D.
26  Schaeffer, Christina L. Darwall, Lyle Everingham, F. Warren McFarlan, Ruth M. Owades, Larry D. Thompson,
    and John L. Weinberg.

    CONSOLIDATED CLASS ACTION ERISA COMPLAINT
    Case No. C 01-5027 CRB; Page 1

1        Plaintiffs' allegations against Providian Financial Corporation ("Providian" or the

2 "Company") and others concerning the Providian Financial Corporation 401(k) Plan (the "Plan")

3 are set out below. Plaintiffs note, however, that as of the date of this First Amended and

4 Consolidated Complaint ("Complaint"), discovery has only just begun. For example, Plaintiffs

5 have not yet received basic Plan documents such as the minutes of the committee(s) which

6 administered the Plan on a day to day basis. As a result, it is likely that once the discovery

7 process is truly underway, the roles of now unknown co-fiduciaries and other actors in the

8 wrongdoing outlined below will be revealed, and Plaintiffs will then seek leave to amend this

9 complaint to add new parties and/or new claims.

10                            **I. NATURE OF THE ACTION**

11      1.     Plaintiffs bring this action as a class action pursuant to Rules 23(a), (b)(1), (b)(2)

12 and (b)(3) of the Federal Rules of Civil Procedure on behalf of a class of over 10,000 Providian

13 employees and certain other people (the "Class" is defined more specifically below) who were

14 participants in the Plan or received benefits under it at any time from July 17, 2001 to the present

15 (the "Class Period"). Their retirement assets in the Plan, to the extent they were in the form of

16 Providian stock, are now virtually worthless as a direct result of the unlawful conduct described

17 below.

18      2.     This Complaint alleges that the persons responsible for safeguarding the assets of

19 the Plan are liable for breaching their fiduciary duties under the Employee Retirement Income

20 Security Act ("ERISA") § 404(a) (29 U.S.C. § 1104(a)(2)). These Defendants breached their

21 duties of prudence, care and loyalty by, *inter alia*, (i) failing to disclose complete and accurate

22 information concerning the Plan and its investments to the participants of the Plan; (ii) failing to

23 monitor Providian stock and failing to ensure that it was a prudent investment for the Plan;

24 (iii) failing to avoid conflicts of interest; and (iv) failing, among other things, to monitor the

25 fiduciaries who allegedly were managing these plans but who were in fact grossly derelict in

26 their duties.

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 2

3.     Beginning on July 17, 2001, when Providian announced 23% Earnings Growth in Second Quarter 2001, the Company systematically misrepresented its financial results through accounting improprieties, by massively understating its loan loss reserves and provisions, and by changing, without disclosure, the way it accounted for bankruptcy charge-offs in such a manner as to defer losses to a subsequent quarter.

4.     As is described below, since July 17, 2001 Defendants have consistently represented to employees that Providian's financial situation was strong and improving, and that Providian's stock price was likely to increase.

5.     Participants in the Plan, who had no knowledge of the accounting improprieties, were encouraged by the statements of directors and officers of Providian regarding the financial strength of the Company, and were further misled about the suitability of a single-stock investment for retirement even aside from Providian's specific financial conditions. As a result, Plan participants continued to add more Providian stock to their accounts, and/or continued to retain Providian shares instead of diversifying their holdings.

6.     Throughout the Class Period, Defendants repeatedly encouraged Providian employees to contribute a portion of their salaries to the Plan. Defendants did so, in part, because by encouraging such an investment they, and the other Providian executives, could pay employees with inflated stock, as opposed to cash, thereby making cash available to pay themselves millions of dollars in bonuses and compensation. In addition, keeping stock in the hands of Company employees helped keep the stock price from a dramatic drop when the Company announced bad news. With shares tied up in the Plan, where they could not be easily traded, fewer were sold by worried Plan participants. This allowed Defendants to sell their shares, while the employees did not do so, due in part to the incessant hyping of Providian stock by Defendants.

7.     Bad news began to emerge regarding Providian's true financial condition on October 18, 2001, when Defendants announced Providian's dismal results for the Third Quarter

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 3

of 2001. These revelations caused the price of Providian's stock to fall to $5.15 per share, down almost 60% from the preceding day, and more than 90% from $59.80 per share at the start of the Class Period.

8.     In the end, Providian employees lost large portions of their retirement accounts and much of their life savings, while Providian directors and officers made millions of dollars.

## II. JURISDICTION AND VENUE

9.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1131 (federal question) and the specific jurisdictional statute for claims of this type, ERISA § 502(e)(1) (29 U.S.C. § 1132(e)(1)).

10.     This Court has personal jurisdiction over Defendants because, pursuant to 29 U.S.C. § 1332(e)(2), one or more of the Defendants may be found in this District. Providian is headquartered in this District, Defendants systematically and continuously do business in this District, and the case arises out of Defendants' acts within this District.

11.     Venue is properly laid in this district pursuant to ERISA § 502(e)(2) (29 U.S.C. § 1132(e)(2)) because the Plan was administered in this district, some or all of the fiduciary breaches for which relief is sought occurred in this district, and Providian is found in this district.

## III. THE PARTIES

**A.     Plaintiffs**

12.     Plaintiff Ruth Spindler is a resident of California. She worked for Providian for three years and participated in the Plan. She is a "participant" in the Plan, as described below, within the meaning of ERISA § 3(7) (29 U.S.C. § 1002(7)). In 2001, she held approximately 63 shares of Providian stock in the Plan. In 2001 alone, the value of her holdings dropped from approximately $50.00 per share to approximately $3.00 per share, representing a loss to her retirement savings of approximately $3,000.

13.     Plaintiff Philip Edwards is a resident of California. He worked for Providian for approximately five and one-half years and participated in the Plan. He is a "participant" in the

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 4

Plan, as described below, within the meaning of ERISA § 3(7) (29 U.S.C. § 1002(7)). In 2001, he held approximately 1730 shares of Providian stock in the Plan. In 2001 alone, the value of his holdings dropped from approximately $50.00 per share to approximately $3.00 per share, representing a loss to his retirement savings of approximately $81,000.

14.    Plaintiff Joseph Wong is a resident of California. He worked for Providian for over six years and participated in the Plan. He is a "participant" in the Plan, as described below, within the meaning of ERISA § 3(7) (29 U.S.C. § 1002(7)). In 2001, he held approximately 988 shares of Providian stock in the Plan. In 2001 alone, the value of his holdings dropped from approximately $50.00 per share to approximately $3.00 per share, representing a loss to his retirement savings of approximately $46,000.

15.    Plaintiff David Michael Peters is a resident of California. He worked for Providian for approximately six and a half years and participated in the Plan. He is a "participant" in the Plan, as described below, within the meaning of ERISA § 3(7) (29 U.S.C. § 1002(7)). In 2001, he held approximately 937 shares of Providian stock in the Plan. In 2001 alone, the value of his holdings dropped from approximately $50.00 per share to approximately $3.00 per share, representing a loss to his retirement savings of approximately $44,000.

16.    Plaintiff Christian Sommer is a resident of California. He worked for Providian for approximately one and a half years and participated in the Plan. He is a "participant" in the Plan, as described below, within the meaning of ERISA § 3(7) (29 U.S.C. § 1002(7)). In 2001, he held approximately 323 shares of Providian stock in the Plan. In 2001 alone, the value of his holdings dropped from approximately $50.00 per share to approximately $3.00 per share, representing a loss to his retirement savings of approximately $15,000.

17.    Plaintiff Cynthia Boyajian is a resident of California. She worked for Providian for approximately three years and participated in the Plan. She is a "participant" in the Plan, as described below, within the meaning of ERISA § 3(7) (29 U.S.C. § 1002(7)). In 2001, she held approximately 174 shares of Providian stock in the Plan. In 2001 alone, the value of her

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 5

holdings dropped from approximately $50.00 per share to approximately $3.00 per share, representing a loss to her retirement savings of approximately $8,000.

18.     Plaintiff Fred Williams was a participant in the Plan and held Company stock in his Plan account and was damaged thereby.

19.     Plaintiff Jeannie Lowery was a participant in the Plan and held Company stock in his Plan account and was damaged thereby.

20.     Plaintiff Veronica Melton was a participant in the Plan and held Company stock in his Plan account and was damaged thereby.

21.     Plaintiff Ramon J. Holmes was a participant in the Plan and held Company stock in his Plan account and was damaged thereby.

**B.     Defendants**

22.     As is alleged more fully below in section VI ("Defendants' Fiduciary Status"), each Defendant is a "fiduciary" of the Plan within the meaning of ERISA § 3(21)(A) (29 U.S.C. § 1002(21)(A)).

23.     Defendant Providian is a Delaware corporation with its principal office located in San Francisco, California.  Providian is a diversified consumer lender and one of the largest VISA and MasterCard issuers in the United States.  The Company offers a variety of other loan products, including revolving lines of credit, secured credit cards, and fee-based products. The Company traditionally specialized in lending to customers with weak credit histories.  During the Class Period, Providian had approximately 284 million shares of common stock outstanding, and the stock traded in an efficient national market on the New York Stock Exchange ("NYSE") under the ticker symbol "PVN".

24.     Defendant Providian is the named fiduciary of the Plan and is the Plan Administrator.  Both by named status and by action, Providian exercises discretionary authority or control respecting administration and respecting management of the Plan and its assets, all within the meaning of ERISA § 3(21), 29 U.S.C. § 1002(21).  As Plan sponsor, Providian also

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 6

exercises fiduciary authority or control.  Providian is also a party in interest as to the Plan within the meaning of ERISA § 3(14), 29 U.S.C. § 1102(14).

### Advisory Committee(s) Defendants

25.    Defendants John Does Nos. 1-100 were at all relevant times members of the Advisory Committee(s) of the Plan.  Their identity is now unknown to Plaintiffs.  Once their identity is discovered, Plaintiffs will seek leave to amend to join them under their true names. These Defendants are referred to as the "Administrative Committee Defendants."

### Providian Officer and Board Member Defendants

26.    Defendant Shailesh J. Mehta ("Mehta") was Chief Executive Officer, President, and a director of the Company at all relevant times.  During the Class Period, Mehta was in possession of material confidential adverse information concerning Providian.  Mehta took advantage of his and others' false statements and omissions and the artificial inflation of the Company's stock caused thereby and sold or disposed of **107,658 shares** of Providian stock at artificially inflated prices as high as $56.75 per share, reaping illegal insider trading proceeds of more than **$5.1 million** during the Class Period.  Following the publicity of the events set forth herein, Mehta agreed to resign from the Company.

27.    Defendant David Alvarez ("Alvarez") was Vice Chairman of the Company, a director, and President of the Company's Integrated Card Business, which handles Providian's credit card accounts.  During the Class Period, Alvarez was in possession of material confidential adverse information concerning Providian.  Alvarez took advantage of his and others' false statements and omissions and the artificial inflation of Providian stock caused thereby and sold **400,091** shares of Providian stock at artificially inflated prices as high as $56.75 per share, reaping illegal insider trading proceeds of more than **$18 million**.  Alvarez resigned from the Company in December 2001.

28.    Defendant David J. Petrini ("Petrini") was the Vice Chairman of Finance, Administration and Technology, and a director of the Company, at relevant times hereto.  He

N:\CLIENTS\25535\1\PLEADINGS\CONSOLIDATED.COMPLAINT.FINAL.06142002.DOC

resigned from this position on February 19, 2002, although he agreed to serve as Chief Financial Officer until a replacement for James Rowe was named. At all relevant times, Petrini was in possession of material confidential adverse information concerning Providian and he issued false and misleading statements and made material omissions regarding Providian and its business prospects and financial position during the Class Period.

29. Defendant James Rowe ("Rowe") was at all relevant times the Chief Financial Officer and an Executive Vice President of the Company. During the Class Period, Rowe was in possession of confidential adverse information concerning Providian. Rowe took advantage of his and others' false statements and omissions and the artificial inflation of Providian stock caused thereby and sold 12,127 shares of Providian stock at artificially inflated prices as high as $56.75 per share, reaping illegal insider trading proceeds of $613,717. In addition, Rowe signed Providian's Quarterly Report on Form 10-Q for the quarter ended June 30, 2001. Rowe resigned from the Company in February 2002.

30. Defendant J. David Grissom ("Grissom") was, at times relevant hereto, a director of the Company.

31. Defendant Leonard D. Schaeffer ("Schaeffer") was, at times relevant hereto, a director of the Company.

32. Defendant Christina L. Darwall ("Darwall") was, at times relevant hereto, a director of the Company.

33. Defendant Lyle J. Everingham ("Everingham") was, at times relevant hereto, a director of the Company.

34. Defendant F. Warren McFarlan ("McFarlan") was, at times relevant hereto, a director of the Company.

35. Defendant Ruth M. Owades ("Owades") was, at times relevant hereto, a director of the Company.

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 8

1    36.    Defendant Larry D. Thompson ("Thompson") was, at times relevant hereto, a

2    director of the Company.

3    37.    Defendant John L. Weinberg ("Weinberg") was, at times relevant hereto, a

4    director of the Company.

5    38.    The Defendants referred to in this subsection (paragraphs 26-37) are collectively

6    referred to at times as the "Individual Defendants."

7    **Human Resources Committee Defendants**

8    39.    Defendants McFarlan, Everingham, and Weinberg were also members of the

9    Providian Board of Director's Human Resources Committee, which oversees and administers the

10   Plan. As described below, they were fiduciaries with respect to the Plan. They are collectively

11   referred to at times as the "Human Resources Committee Defendants."

12   ## IV. THE PLAN

13   40.    The Plan was and is an eligible individual account Plan within the meaning of

14   ERISA § 407 (29 U.S.C. § 1107) and was also a qualified cash or deferred arrangement within

15   the meaning of I.R.C. § 401(k) (26 U.S.C. § 401(k)). The EIN number is 94-2933952 and the

16   plan number is 001.

17   41.    Employees may participate in the Plan (and are "eligible employees") if they are

18   regularly scheduled to work at least 20 hours per week, or they may participate once they have

19   completed 1,000 hours of service in a 12 month period. They cannot be covered by a collective

20   bargaining agreement unless the agreement expressly provides for such coverage. Eligible

21   employees may commence participation in the Plan on the first day of the third calendar month

22   following the performance of their first hour of work.

23   42.    The plan is composed of two components: (1) a savings component which

24   includes Voluntary Participant Contributions and Company Matching Contributions; and (2) a

25   retirement component consisting solely of Company Retirement Contributions.

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 9

**(a) Voluntary Participant Contributions**

43.     Participants in the Plan may contribute from 1% to 13% of their eligible base pay in any combination of before-tax salary deferrals or after-tax contributions subject to certain limits described by the Code.  Participants may also roll over amounts representing distributions from former employer's qualified plans.

**(b)     Company Matching Contributions**

44.     Participants' contributions in the Plan, up to 6% of their annual earnings, are matched by Providian at a level of 55 cents on every dollar.  All of Providian's matching contributions are invested solely in Providian stock and could not be re-directed among the other investment options until and to the extent that the participant was vested, as described below.

**(c)     Company Retirement Contributions**

45.     All eligible employees participate also in the so-called "retirement" component of the Plan after completing one year of service.  The retirement funds are placed in a separate account within the Plan.  This account requires no contribution on behalf of the Plan participant. Annual contributions are made, in the form of cash, after the end of each year.  The amount contributed will be based on a percentage of the participants' compensation earned after becoming eligible to participate in the retirement component of the Plan.  This percentage, if any, is determined by Providian at its discretion.

**(d)     Investment Options**

46.     The participants and beneficiaries of the Plan are presented with alternative investment options represented to them as suitable for participant contributions and Company retirement contributions.  One of the alternative investment options presented to the participants and beneficiaries of the Plan is Providian stock.

**(e)     Vesting**

47.     Participant Contributions are immediately 100% vested.  A participant becomes 100% vested in Company Retirement Contributions and Company Matching Contributions if the

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 10

1    participant reaches age 65, dies, or becomes disabled while employed by the Company.

2    Otherwise, the participant vests as follows:

3            Company Retirement Contributions

4                    An employee's rights in the Company Retirement Contributions vest 20%
5                    upon completion of the third year of employment and an additionally 20%
                     for each completed year of employment thereafter until fully vested.

6            Company Matching Contributions

7                    An employee's rights in the Company Matching Contributions vest in one-
8                    third increments upon completion of each of the first three years of
                     employment.   Prior to January 1, 2002, an employee's rights in the
9                    Company Matching Contributions vested 50% upon completion of the
                     third year of employment and an additional 50% upon completion of the
10                   fourth year of employment.

11           48.    If the participant terminates employment before becoming fully vested, the

12   participant will not be entitled to receive the non-vested percentage of Providian's contributions.

13           **(f)    Assets**

14           49.    As of December 31, 2000, the Plan held 1,106,503 shares of Providian common

15   stock with a market value of $63.6 million.

16                              **V.  CLASS ALLEGATIONS**

17           50.    As alleged at the outset, Plaintiffs bring this action as a class action pursuant to

18   Fed. R. Civ. P. 23.  The Class consists of all persons who are now and were during the Class

19   Period (July 17, 2001 to the present) participants or beneficiaries of the Plan.  Plaintiffs easily

20   meet the Rule 23(a) prerequisites to bring this action on behalf of the Class because:

21           •   **Numerosity.**  The Class consists of thousands of individuals and is so numerous that

22               joinder of all members as individual plaintiffs is impracticable.

23           •   **Commonality.**  There are questions of law and fact common to the Class.

24           •   **Typicality.**  Plaintiffs' claims are typical of the claims of the class.

25

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 11

1

2

3

4

5

6

- **Adequacy.** Plaintiffs will fairly and adequately protect the interests of the Class. They have no interests that are antagonistic to or in conflict with the interest of the Class as a whole, and they have engaged competent counsel, highly experienced in ERISA class actions concerning employer securities in 401(k) plans, as well as in other class and complex litigation, to ensure protection of the interests of the Class as a whole.

7

8

9

10

11

12

13

14

51.     Plaintiffs also meet the requirements of Rule 23(b). As an ERISA breach of fiduciary duty action pursuant to sections 409, 502(a)(2), and 502(a)(3) of ERISA (29 U.S.C. §§ 1109, 1132(a)(2), 1132(a)(3)) this is a classic Rule 23(b)(1)(B) class action. The prosecution of separate actions by the members of the Class would create a risk of adjudications with respect to individual members of the Class which would, as a practical matter, be dispositive of the interests of the other members not party to the adjudications or substantially impair or impede their ability to protect their interests. However, this action is also maintainable as a class action under the other subsections (b) of Rule 23:

15

16

17

18

- Rule 23(b)(1)(B). The prosecution of separate actions by the members of the Class would create a risk of inconsistent or varying adjudications with respect to the individual members of the Class, which would establish incompatible standards of conduct for Defendant.

19

20

21

- Rule 23(b)(2). The Defendant has acted or refused to act on grounds generally applicable to the Class, thereby making appropriate final injunctive, declaratory, or other appropriate equitable relief with respect to the Class as a whole.

22

23

24

25

- Rule 23(b)(3). Questions of law and fact common to members of the Class predominate over any questions affecting only individual members, and the class action is superior to other available methods for the fair and efficient adjudication of the controversy.

26

1

## VI. DEFENDANTS' FIDUCIARY STATUS

2    52.    During the Class Period, Defendants were fiduciaries of the Plan, both as named

3 fiduciaries and de facto fiduciaries.

4    53.    **Named Fiduciary**. ERISA requires every plan to provide for one or more named

5 fiduciaries, who will have "authority to control and manage the operation and administration of

6 the plan." ERISA § 402(a)(1) (29 U.S.C. § 1102(a)(1)).  During the Class Period, and before, the

7 Company was named as the Plan Administrator, thereby automatically making itself an ERISA

8 fiduciary pursuant to ERISA § 402(a)(1) (29 U.S.C. § 1102(a)(1)).  Additionally, pursuant to the

9 Plan, the Company could delegate its administrative duties to an Advisory Committee, thereby

10 making the members of that committee named fiduciaries of the Plan.  Furthermore, under this

11 same standard, the Human Resources Committee Defendants were also fiduciaries of the Plan.

12    54.    **De Facto Fiduciary.**  ERISA treats as fiduciaries not only persons explicitly

13 named as fiduciaries under section 402(a)(1), but also any other persons who act in fact as

14 fiduciaries, *i.e.*, perform fiduciary functions.  ERISA § 3(21)(A)(i) (29 U.S.C. § 1002(21)(A)(i))

15 makes a person (including a juridical person such as the Company) a fiduciary "to the extent...he

16 exercises any discretionary authority or discretionary control respecting management of such

17 plan or exercises any authority or control respecting management of disposition of its assets...").

18 Instead of delegating fiduciary responsibility for the Plan to external service providers, as many

19 plan sponsors do, Providian chose to comply with the requirement of section 402(a)(1) by

20 internalizing the fiduciary function.  Providian itself, through its various employees and agents,

21 in fact performed fiduciary functions, and thereby was a fiduciary under ERISA, quite aside from

22 its status as a named fiduciary.

23    55.    Additionally, the Individual Defendants performed fiduciary functions under this

24 standard, and thereby also acted as fiduciaries under ERISA, by among other things, appointing

25 members of the Advisory Committee.

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 13

1    56.    Furthermore, employers and officers/directors act in a fiduciary capacity under

2  ERISA when they mislead employees about the character and prospects of the Company for the

3  purpose of affecting the employees' ERISA plan elections.  During the Class Period,

4  communications made by Providian and the Individual Defendants with Plan participants

5  included material misrepresentations and omissions to induce them to continue to invest in and

6  maintain investments in the Company's shares in the Plan and to accept at face value

7  investments in the Company's shares.  In this way, Providian and the Individual Defendants also

8  acted as fiduciaries under ERISA and therefore were fiduciaries.

9    57.    Finally, under ERISA, in various circumstances non-fiduciaries who knowingly

10  participate in fiduciary breaches may themselves be liable.  To the extent any of the Defendants

11  are held not to be fiduciaries, they remain liable as non-fiduciaries who knowingly participated

12  in the fiduciary breaches described below.

13                **VII. PROVIDIAN'S BUSINESS AND ITS MISCONDUCT**

14  **A.    Background Information**

15    58.    Providian is engaged in the business of diversified consumer lending and has over

16  16 million customers.  Prior to the Class Period, Providian consistently reported significant

17  revenue growth and turned the sub-prime segment of its operations into a booming business by

18  charging above-market rates to high-risk consumers.  Providian and the investing community

19  attributed this success, in large part, to Providian's sophisticated computer models developed by

20  Mehta to price credit card products for risk and risk volatility.  Through its proprietary customer

21  segmentation and credit risk models, the Company tried to identify customers in the sub-prime

22  market that it believed would have significantly lower default rates than the average for such

23  population generally.  The models were designed to enable Providian to offset the risks of sub-

24  prime loans through higher yields.  Providian's business thrived on the Company's ability to

25  cherry pick subprime borrowers to reach what Mehta dubbed the "Efficient Frontier" – a level of

26  profitable returns from the target market.

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 14

1    59.    The Company securitizes a significant portion of its assets, thereby reducing its

2    need for funding from other sources.  A securitization generally involves the transfer by the

3    Company to a trust or other special purpose entity of loans receivable generated by a designated

4    pool of accounts.  The trust or special purpose entity may issue either certificates representing

5    undivided ownership interests in, or notes collateralized by, the loans receivable.

6    60.    Providian administers both its own loan portfolio ("Reported") and those of

7    accounts it has sold off through securtizations.  These combined portfolios are deemed

8    "Managed."  The securitized loans do not appear on the face of the balance sheet of Providian, as

9    Providian no longer has a direct ownership interest in these assets.  However, Providian has

10   continued liability with regard to credit losses on these securitized loans.  The losses related to

11   the securitized loan portfolio are not recognized as part of Providian's loan allowance (on the

12   balance sheet) or through the loan loss provision (on the income statement), but rather are netted

13   against income accounts associated with the securitized loan portfolio servicing on Providian's

14   income statement.  Thus, while not named directly on the income statements, charge-offs related

15   to the securitized loan portfolio flow through Providian's income statement.  Therefore,

16   chargeoffs related to the securitized portfolio have a direct impact on the Company's loss

17   provision which, in turn, directly impacts its reported earnings.  Providian's reported earnings

18   and charge-off rates are critical to its stock price.

19   61.    In 1999, the Company faced accusations in investigations and lawsuits by the

20   Office of the Comptroller of the Currency, the San Francisco District Attorney's office, and other

21   state and local agencies and customers that Providian engaged in misleading sales tactics and

22   improper assessment of fees in its routine business practices.  To settle the lawsuits and

23   government investigations, in 2000, Providian paid more than $400 million and agreed to

24   institute new quality control procedures.  As part of its initiative to enhance customer

25   satisfaction, the Company established a guarantee that offers the cancellation of unwanted

26   products, the refund of fees, and extensions of grace periods for late payments on credit cards.

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 15

1   These business changes substantially and negatively affected Providian's fee-based and other
2   income.

3       62.     According to the Company's Form 10-Q for the quarter ending June 30, 2001, the
4   primary factors affecting the Company's profitability include: growth in the number of customer
5   accounts and outstanding loan balances; credit usage; and credit quality, which encompasses
6   delinquencies and credit losses.  One of the key factors affecting Providian's profitability is the
7   net loss rate for debts charged-off through consumer bankruptcies.

8       63.     Using its computer models, Providian grew its managed loan portfolio to $27.1
9   billion in 2000 and collected $2.2 billion in credit card fees, a 27-fold increase from 1995.  Year
10  after year, the Company pledged average annual earnings increases of at least 25%.

11      64.     From its inception as a public Company in 1997, Providian's computer models
12  had never been tested in a challenging economic climate.  In 2001, sub-prime accounts held by
13  borrowers with poor credit constituted approximately 29% of Providian's loan portfolio.
14  According to a former Providian Vice President of Operations and Sales, Providian's predictive
15  models that tracked performance of the subprime accounts reflected that such accounts were not
16  performing as the models suggested they should at the end of Fourth Quarter 2000.  In late 2000
17  and early 2001, Mehta believed that the collections volume was going to escalate and became
18  more involved in the day-to-day operations of the Company.  Mehta initiated significant high-
19  level personnel changes to focus on the emerging pattern of late payments and bankruptcies
20  coming into the collections department.  Nevertheless, the Company did not adjust its computer
21  models to account properly for the new negative macroeconomic environment.

22      65.     Michael Kelleher was the staff senior vice president in charge of risk models in
23  Providian's credit department.  He was primarily responsible for creating and interpreting
24  predictive models for the Company.  The predictive models projected customers' levels of
25  borrowing and patterns of payment, such as 30, 60, 90, or 180 days to pay the amount borrowed.
26  According to a former Vice President of Operations and Sales at Providian, senior managers and

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 16

1   others could and did look at the Company's databases at the beginning of 2001 and knew that

2   customers were increasing their credit card balances to pay other credit card debts.  Beginning in

3   October 2000, a Providian Senior Vice President who ran models for Petrini and many others in

4   the Company, told Petrini and other senior managers that the financial models were flawed, that

5   the projections were not accurately reflecting actual loss rates, and that the Company was in

6   trouble.  Adding to the problems, rates of borrowing were much higher at the beginning of 2001

7   than what had been predicted by the models.  Management also determined in late 2000 and

8   early 2001 that the Platinum or super-prime (high-end) segment of its business was saturated

9   with little expectation of growth.

10          66.    According to a former Providian Senior Vice President of

11  Marketing/Acquisitions, in March and April 2001, Providian's loss curve projections reflected

12  that loss rates were going to be much higher than what the Company was telling investors and

13  securities analysts (the "Street").  The loss curve projections were part of the Company's

14  financial plan.  They projected the profitability of Providian's loan portfolio out over multiple

15  quarters and years.  Mehta, Alvarez, Petrini, Rowe, and other senior managers were well aware

16  at all times of the Company's loss rate projections.  Management believed it was a serious

17  problem.  Nevertheless, management told the Street that the loss rate or net charge-off rate would

18  be at 10% or below, although current loss curve projections going out several months clearly

19  reflected the loss rate would be 12-13%, or even higher.

20          67.    A former Providian Executive Vice President states that Petrini told Mehta and

21  Rowe in May 2001 that Providian's loss curve projection confirmed that loss rates would be

22  much greater than what the Company had represented to the Street.

23          68.    Knowing the dire financial situation facing the Company, Alvarez wanted to

24  speak to the Board immediately about the loss rate issues, but Mehta refused because, he said, he

25  wanted instead to tell the Board later that the issues had been managed.  Providian senior

26  management, the Credit Risk Review Committee, credit analysts, financial analysts, and

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 17

1   marketing managers all knew about the escalating loss rate projections.  An internal group of

2   managers working with the top-level managers wanted to go to the Board to report the

3   Company's loss rate crisis, but they were afraid to go around Mehta to the Board.  According to

4   the former Senior Vice President of Marketing/Acquisitions, the Company significantly reduced

5   marketing mail volume in selective segments in April and May 2001 because loss rate

6   projections were in the 12-13% range.  Based on information in hand, the Company had

7   previously reduced marketing in some segments in January and February 2001.

8           69.     Providian posted what analysts reported as solid results for First Quarter 2001,

9   with earnings per share ("EPS") of $0.78 ($0.01 over the consensus of securities analysts) and a

10  net charge-off rate of 9.3%.  In addition, management stated that the net charge off rate in

11  Second Quarter 2001 was likely to peak at 10%.  Providian also indicated to analysts that it was

12  backing off from the sub-prime segments and targeting higher-quality customers with lower

13  credit risk.  Management further predicted that its loan losses would peak in the Second Quarter,

14  in part because of the Company's alleged shift in focus to higher quality credit accounts.  In

15  April 2001, the Company issued guidance for its fiscal 2001 EPS to range from $3.25-$3.45.  For

16  Second Quarter 2001, analysts' consensus estimate for annual EPS was $0.79.  In a report dated

17  April 20, 2001, analysts for The Investext Group reported that they were "counting on the

18  company's disciplined risk-management skills to see it through what should be an industry-wide

19  surge in losses over the next 12-18 months."

20          70.     By the end of May 2001, problems with Providian's receivables reached crisis

21  levels, and Defendants knew that it was improbable that the Company would meet its projected

22  earnings for Second Quarter 2001.  Nevertheless, in May 2001, Defendant Alvarez reiterated the

23  Company's 2001 EPS guidance of $3.25-$3.45.  In addition, on May 16, 2001, Defendant Mehta

24  and others indicated to analysts at Banc of America Securities that credit was tracking as

25  expected and losses were expected to peak at 9.5- 10% in the Second Quarter.  On May 16, 2001,

26  the Banc of America analysts spent the entire day in meetings with Mehta and others at

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 18

Providian and reported: "Providian recognizes bankruptcies nearly immediately versus an industry standard of a month lag...The bad news on bankruptcy is already in the numbers at Providian."

71.    Throughout June 2001, analysts reported that management consistently emphasized that the loss rate, a key metric of the credit quality of a credit card lender, would not exceed 10% and that delinquencies would peak in Second Quarter and decline in Third Quarter 2001.

72.    In reality, in early and mid-June 2001, Defendants were scrambling to find ways to meet their projected Second Quarter results. The Company's Platinum and Super Prime business lines were not profitable, and their loss rates in these traditionally lower-risk lines were climbing in June from the usual 6% to 8-9%. Although Providian sold some of its sub-prime business lines with loss rates ranging from 17-20%, Mehta, Alvarez, Petrini, and Rowe became abundantly aware that the charge-off rate would far exceed their guidance for the Second Quarter.

73.    On June 18, 2001, without notification to employees, analysts, or shareholders, the Company changed from its publicized policy and practice of immediately writing off receivables upon receipt of electronic notification that customers had filed for bankruptcy protection to "batch processing," essentially collecting two weeks' worth of bankruptcy filings and then recognizing those losses at the end of that two-week period. Previously, Providian had recognized these filings and the related losses on a daily basis. The undisclosed change in bankruptcy processing was inconsistent with and contradicted Defendants' prior representations to analysts. Defendants implemented this change to push $24 million of losses forward from June (Second Quarter) and into July 2001 (Third Quarter). As a result, the reported Second Quarter 2001 net charge-off rate of 10.29% was manipulated downward and EPS were overstated by $0.05. Without the change in bankruptcy processing, the net charge-off rate would

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 19

1    have been 10.63%, well above the Company's estimate.  The change affected the Company's

2    entire portfolio, not just the securitized portion.

3        74.    Fee income for the first six months of 2001 totaled $1.17 billion, a mere four

4    percent increase from the first six months of 2000.  According to a former Executive Vice

5    President of Providian, by July 2001, the Company's operations and management were in

6    disarray.  The Company did not know what its numbers were or what story to tell the investing

7    public.  The Company's story kept changing and Nancy Murphy, Director of Investor Relations,

8    continually sought clarification regarding what she was to report to the Street.  Murphy, the

9    former Executive Vice President, confirms that there was a huge disconnect between the

10   numbers according to Alvarez and according to Petrini.  The Executive and Administrative

11   Committee (consisting of Mehta, Rowe, Petrini, Alvarez, Ellen Ritchey, Jim Redmond, Jim

12   Jones, and others) was supposed to meet twice a month, but starting in August 2001, the

13   committee met every day because of the financial and operational chaos within the Company.

14       75.    With fee income slackening and the economy deteriorating, the Company faced

15   increasing pressure to meet its promised earnings growth.  A former Senior Vice President of

16   Marketing/Acquisitions confirms that "loan loss curve projections were now being run weekly in

17   a panic as opposed to monthly," which had been the Company's practice prior to August 2001.

18   Accordingly, in August 2001, Mehta and Alvarez decided to loosen and change credit

19   requirements for customers.  Consequently, Providian extended loans deeper into the sub-prime

20   and middle segments and raised credit limits for existing sub-prime and middle business line

21   customers.  Mehta changed the policy to allow marketing to middle business customers with loss

22   rates as high as 15%, which was a change from prior requirements of below 10%.  The former

23   Senior Vice President of Marketing/Acquisitions confirms that credit limit increases were also

24   offered to risky profile borrowers, despite the Company's awareness, as early as April 2001, that

25   loss rates on expanded lines constituting as much as fifty percent of the Company's loan

26   portfolio were much higher than projected.  A former Executive Vice President for Providian

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 20

1    confirms that the changes in credit criteria requirements were discussed in a senior staff meeting

2    in August 2001 and that Jim Redmond, the former chief credit risk officer and day-to-day

3    manager of credit, overtly opposed the changes because they would interfere with the

4    Company's computer models and exacerbate already problematic levels of risk and bad credit.

5    **B.    Providian's False and Misleading Financial Results Are Reported to Unsuspecting Employees and the Market**

6

7        76.    Beginning on July 17, 2001, Defendants systematically misrepresented

8    Providian's financial results through accounting improprieties, by massively understating its loan

9    loss reserves and provisions, and by changing, without disclosure, the way it accounted for

10   bankruptcy charge-offs in such a manner as to defer losses to a subsequent quarter.  Through the

11   misrepresentations and omissions described below, Defendants breached their fiduciary duty to

12   disclose complete and accurate information regarding Providian stock, one of the investment

13   options in the Plan.  This duty includes both a negative duty not to misinform, and an affirmative

14   duty to inform when the fiduciary knows or should know that silence might be harmful.

15   Additionally, through the misrepresentations and omissions described below, Defendants

16   breached their fiduciary duties to monitor Providian stock and ensure that it is a prudent

17   investment, and breached their fiduciary duty to avoid conflicts of interest.

18       77.    On July 17, 2001 Defendants issued a press release to investors, including

19   employee investors, announcing Providian's financial results for the Second Quarter of 2001.

20   The release was entitled "Providian Financial Corporation Announces 23% Earnings Per Share

21   Growth in Second quarter 2001," and provided, in pertinent part:

22           **Providian Financial Corporation (NYSE: PVN) today announced
             24% net income growth resulting in a 23% earnings per share growth
23           for the second quarter of 2001.  Earnings totaled $323.4 million, or
             $0.79 per diluted share**, compared to earnings of $187.6 million, or $0.64
24           per diluted share, for the second quarter of 2000, before one-time
             adjustments.

25                                                                    * * *

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 21

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

Total managed revenue, comprised of managed net interest income and non-interest income, climbed to $1.76 billion in the second quarter of 2001, a 29% increase over the second quarter of 2000, before one-time adjustments. In the second quarter, managed net interest income was $962.2 million and managed non-interest income was $802.4 million, an increase of 40% and 18%, respectively, over the second quarter of 2000, before one-time adjustments. The managed net interest margin on loans rose to 13.13% in the second quarter of 2001 from 12.77% in the first quarter of 2001.

**Consistent with the company's expectations for the seasoning of the portfolio and the rise in year-to-date consumer bankruptcies, the managed net credit loss rate in the second quarter was 10.29% versus 9.34% in the first quarter of 2001.** The 30+ day managed delinquency rate was 8.04% at quarter end, a slight increase from 7.64% at the end of the first quarter of 2001. Based on the trend in the 90+ day delinquency rate the company continues to expect an improved credit loss rate in the third quarter of 2001. The company's loan loss reserves totaled $1.53 billion at the end of the second quarter, representing 10.55% of reported loans.

The company's non-interest expense for the second quarter was $621.6 million, leading to an improvement in the efficiency ratio to 35% for the quarter from 37% in the second quarter of 2000, before on-time adjustments, despite absorbing higher collection costs. The efficiency ratio improvement was driven in part by continued cost savings from the integration of the company's credit card platforms.

The company's return on managed assets was 2.71% and return on equity was 40.08% for the second quarter. The company ended the quarter with a strong balance sheet, with capital and loan loss reserves totaling $4.1 billion, which represented 19.5% of reported assets and 11.3% of managed assets at quarter end.

"Our financial results for the quarter demonstrate the strength of our adaptive business model. Despite the more challenging economic environment, we continue to deliver strong top-line growth and industry leading returns on assets and equity," said David Petrini, vice chairman. "As we look out to the balance of the year, we are well positioned to continue to produce solid returns while maintaining our leadership position in customer satisfaction."

(Emphasis added).

78.     A key metric of credit quality for credit card issuers, especially for issuers specializing in sub-prime accounts, is the net credit loss rate or the net charge-off rate. Therefore, internal changes that directly impact the net credit loss rate are material to assessing the credit quality of a company and must be disclosed.  Additionally, Defendants did not disclose to the investor employees that that the charge-off rates being compared for the First and Second Quarters 2001 were not calculated in the same manner or for similar periods of time.  Defendants further did not disclose that the reported managed net credit loss rate did not include "year-to-date consumer bankruptcies" as expressly indicated in the Company's earnings release, and thereby overstated EPS by approximately $.05 and delayed the recognition of approximately $24 million in losses.  Through these omissions, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Providian stock, one of the Plan investment options.  Additionally, Defendants breached their duty to monitor Providian stock and ensure that it was a prudent investment for the Plan.

79.     Shortly after they announced Providian's Second Quarter 2001 results, Defendants held a conference call to discuss the results and the Company's prospects going forward.  During the call, and in follow-up conversations with analysts, Defendants Rowe and Petrini stated:

- The Company's loss ratio was 10.29% and would decline in Third Quarter 2001.
- Despite consistently increasing reserves in prior quarters, the Company did not need to in Second Quarter 2001.
- The Company would report Third Quarter 2001 EPS of $0.83.
- The Company was doing more business with its best customers.
- Loan growth reflected the Company's emphasis on attracting higher-end new customers.
- Managed provisions for losses equaled managed charge-offs.
- The Company was conservative leaving reserve balances where they were.

80.     The Company ultimately disclosed in Third Quarter that it failed to accurately provide for charge-offs and adjust for related fees by at least $180 million at the end of Second Quarter 2001. The problems manifested when Providian announced the need to add $50-75 million to its Loan Loss Reserve on September 4, 2001. Defendants added another $186 million to Providian's Loan Loss Provision and incurred a charge of $85 million for uncollectible fees and accrued finance on October 11, 2001.

81.     On the July 19, 2001 audio-taped conference call discussing Second Quarter results, an analyst at Credit Suisse First Boston, Moshe Orenbuch, asked Petrini and Alvarez: 1) whether the loss rate ended the Second Quarter at or above or below the average for the quarter; and 2) what that meant for Providian's confidence in the credit outlook. Petrini and Alvarez falsely responded that on a monthly basis, at the end of the quarter, the loss rate "was lower than the average, which was probably more driven by the bankruptcy side of the equation." They further explained that bankruptcy filings since the end of Second Quarter demonstrated a "moderated trend in July." During the conference, Defendants failed to explain that June's loss rate only included bankruptcy filings for June 1-17, 2001. Additionally, they omitted that bankruptcy filings for the last 2 weeks of June had been pushed into July for reporting purposes and would adversely impact the loss rate for July. Furthermore, Petrini and Alvarez painted a false picture of the Company's credit outlook when asked a direct question about the current impact of, and future outlook based upon, charge-offs in June. Through these omissions and misinformation, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Providian stock, one of the Plan investment options, and breached their duty to monitor Providian stock and ensure that it was a prudent investment for the Plan.

82.     According to a former Senior Vice President, the beginning of the Third Quarter was a high-stress period at the Company. In stark contrast to the solid financial status and strong business prospects reported by Defendants, the Company's numbers were continually being rerun and the models constantly were changing. There was an ongoing internal corporate

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 24

1   planning endeavor that lasted 20 days after the end of the Second Quarter.  A former Providian

2   Senior Vice President worked 79 straight days as she ran roll-up models and profit and loss

3   analyses to try to sort out Providian's on-going financial crisis.  Moreover, the Company's high-

4   level organizational chart changed three times in three months.  Management tried to fire its

5   internal auditor, Angel Thomas, but Ellen Richey, Providian's Corporate Counsel, and other

6   senior human resource executives "saved her job." Nancy Murphy, a Senior Vice President in

7   Investor Relations at Providian, took the position with management that the Company needed to

8   "get its story straight" because management was losing its credibility with the Street as they were

9   changing the story regarding Providian's operations and financial prospects all the time.

10      83.      In a report dated July 29, 2001, Bear Stearns analysts reported after a meeting

11   with Petrini and Nancy Murphy that:

12          • "Providian receives electronic notification of bankruptcy filings and
13            charges off those accounts almost immediately after receiving
               notification."

14          • Favorable July bankruptcy trends should have a positive impact on
15            losses.

16          • "[T]he credit performance of the company's portfolio is generally in
               line with expectations."
17

18      84.      Both Petrini and Nancy Murphy knew at the time they met with the Bear Stearns

19   analysts that the Company's numbers were substantially out of line with what its predictive

20   models forecasted.  As set forth above, the Company's management and operations were in

21   chaos; Alvarez and Petrini could not agree on the numbers the Company was reporting.  Petrini

22   and Nancy Murphy told analysts and investors, including employee investors, that the credit

23   performance of the Company's portfolio was generally in line with expectations (10% or lower

24   loss rates) at the very time that they knew that loss curve rate projections were 12-13% or higher.

25   Moreover, at least Petrini, if not Nancy Murphy, knew that the Company had ceased

26   immediately charging off bankruptcies after receiving notification nearly six weeks earlier and

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 25

1    that July bankruptcy trends would not have a positive impact on losses because almost half of the

2    June bankruptcy charge-offs had been pushed into July.  Through this misinformation, Petrini

3    breached his fiduciary duty to disclose complete and accurate information regarding Providian

4    stock, one of the Plan investment options, and breached his duty to monitor Providian stock and

5    ensure that it was a prudent investment for the Plan.  By virtue of her senior level management

6    position at Providian, Nancy Murphy's false and misleading statements and omissions of

7    material information are attributable to the Company.

8            85.    On July 20, 2001, Bruce Harting of Lehman Brothers issued a research report,

9    which was based upon information that Defendants disseminated during their July 19, 2001

10   conference call as well as follow-up conversations.  The report stated, in pertinent part:

11                   Providian receives electronic notification of bankruptcy filings and
                     charges off those accounts almost immediately after receiving notification.
12                   July bankruptcy trends have been more favorable than during the second
                     quarter, which should have a positive impact on losses if this trend
13                   continues throughout the third quarter.

14           86.    By failing to disseminate truthful information regarding the Company's change in

15   the way it processed bankruptcies, Defendants breached their fiduciary duty to disclose complete

16   and accurate information regarding Providian stock, one of the Plan investment options, and

17   breached their duty to monitor Providian stock and ensure that it was a prudent investment for

18   the Plan.

19           87.    After meeting with Rowe and Petrini, on July 31, 2001, Charlotte Chamberlain,

20   an analyst at Jeffries & Co., issued a report indicating that both Rowe and Petrini agreed that the

21   economy's slowdown and weaker consumer spending presented an ideal economic environment

22   to prove that Providian's business model is "adaptive and capability based" by delivering 20-

23   25% EPS growth. Ms. Chamberlain further reported that Providian "aggressively prices and

24   controls credit lines to minimize exposure to the market's lowest credit-quality customers...."

25   Rowe and Petrini attributed the rise in charge-offs to 10.29% in Second Quarter 2000 to

26

"escalating bankruptcies." Chamberlain reported that bankruptcies are the biggest driver of credit losses, "which seem to have peaked in June." Rowe and Petrini did not inform Ms. Chamberlain that Providian changed the way it processed its bankruptcies in June 2001 and falsely indicated that the Company was poised to deliver 20-25% EPS growth. With the true amount of the Company's charge-offs in June counted, the charge-off rate would have been 10.63% and Providian would have reported earnings lowered by approximately $.05 per share. According to former Senior and Executive Vice Presidents, at the end of July 2001, Rowe and Petrini knew by virtue of their high-level management positions and from information available to them that the Company was in financial distress and that 20-25% EPS growth was not realistic. Both Petrini and Rowe were well aware of undisclosed facts, such as the projected 12-13% or higher loss rates, secret bankruptcy accountancy changes, and understated provisions and reserves in the approximate amount of $180 million, all of which seriously undermined the accuracy of Petrini's and Rowe's statements.

88.     On August 22-24, 2001, the truth began to emerge after analysts discovered Defendants' secret change to Providian's accounting for bankruptcies. Compiled securitized credit card portfolio performance data for July 2001 reflected a sharp reversal in charge-off data for Providian. Analysts flooded Providian's Investor Relations department with calls. Analysts at Friedman, Billings, Ramsey & Co., Inc. reported on August 27, 2001 as follows:

> We contacted the company early last week after the July trust data reported a precipitous 164 basis points rise. The company suggested the significant rise from June levels was a result of 1) slightly higher than expected bankruptcies in July, and 2) attrition in principal trust receivables (the denominator), as new assets have not been added to the trust recently. However, after the fact, it has become abundantly clear the change in bankruptcy processing is the real reason for the trust data movement. **Of greater concern, there was no mention of a change in procedures during any of our discussions with the company over the last month.**

(Emphasis added).

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 27

N:\CLIENTS\25535\1\PLEADINGS\CONSOLIDATED.COMPLAINT.FINAL.06142002.DOC

89.     Providian loosely described its bankruptcy recognition policy in its Second Quarter Form 10-Q filed on August 14, 2001 as: "Accounts of bankruptcy credit card customers are charged off no later than the next billing date following notification of bankruptcy." In its First Quarter Form 10-Q, the Company generally described its bankruptcy recognition policy as: "Accounts of bankruptcy credit card customers are charged off after notification of bankruptcy." The Form 10-Q did not indicate the month in which Providian instituted the policy change.  In addition, the EPS and other financial information provided in the Form 10-Q also was inaccurate and not properly calculated in accordance with Generally Accepted Accounting Principles ("GAAP").  Through these omission and inaccuracies, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Providian stock, one of the Plan investment options, and breached their duty to monitor Providian stock and ensure that it was a prudent investment for the Plan.

90.     When flooded with calls, Providian and senior managers in the Investment Relations Department informed analysts and investors that the bankruptcy processing change was made for "efficiency reasons." Responding to the trickle of specious explanations from management regarding Providian's undisclosed change in bankruptcy recognition during the Second Quarter, on August 24, 2001 and thereafter, analysts following the Company sharply criticized management and speculated on the true reasons for the change.  Analyst reports from Raymond James, Banc of America Securities, Thomas Weisel Partners, Credit Suisse First Boston, Merrill Lynch, Friedman, Billings, Ramsey & Co., Inc., Fox-Pitt, Kelton, and others commented as follows on Defendants' actions:

- The timing of the change (during a quarter when the loss rate exceeded PVN's targets) and the lack of disclosure on the conference call, along with a precise disclosure of the financial impact, has justifiably disappointed investors.

- Management's comment that that change was immaterial to the financial results is based on the view that provisioning levels would have been no different with or without the change.  Had PVN reported

the same level of provisioning with $18.3MM-$22.0MM more in charge-offs, the company would have failed to match charge-offs with provisions by between $13.6MM and $17.3MM, something it has never done during its history as a public company.

- The impact of this change was to delay the recognition of all bankruptcy-related charge-offs after June 18, 2001 to the next billing cycle.  Hence, the disclosed 2Q01 charge-off rate of 10.29% was understated.

- We believe the timing and nature of this processing change creates uncertainty surrounding management's credibility and ability to interact with the Street.

- Providian changed the processing of its bankruptcies during the Second Quarter from immediate to once a month, allegedly for efficiency...[t]he timing of this coming during a particularly tough quarter when losses are spiking concerns us.   Management compounded this by not telling anyone...

- The fact that this was not disclosed is particularly frustrating, as credit losses have been a topic of significant concern.

- Additionally, the company indicated to us that because they already knew about the bankruptcy-related chargeoffs that would occur in July, they already provisioned for those losses in the June quarter.

- Considering that Providian's second quarter provision for losses was effectively in line with charge offs, it is reasonable to assume the company would have had to increase its loss provision had it not changed the policy.  We estimate that had Providian not changed its policy, all else being equal, the company would have earned $0.05 per share less than the $0.79 reported.

91.    As a result of the analysts' revelations, the stock price dropped 9% in intra-day trading, and closed 6.4% lower, down from $43.65 on August 23 to $40.88 on August 24.

92.    On September 4, 2001, prior to the opening of the market and in the wake of rumors about Providian's financial results for the Third Quarter of 2001, Defendants issued a press release entitled "Providian Financial Revises Earnings Guidance." The press release provided, in pertinent part:

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 29

Providian Financial Corporation (NYSE: PVN) today announced that it is revising its 2001 earnings guidance to $3.20 to $3.25 per diluted share, representing a 17% to 19% increase over 2000 earnings per share before one-time adjustments.  In revising its guidance, the Company cited a recent slowdown in customer purchase activity, softer loan demand relative to expectations, and ongoing credit tightening by the Company. In light of these factors, the Company is planning for lower managed loan growth in the range of 29% to 31% for 2001.

In the third quarter, the Company expects to report earnings per diluted share of $0.82 to $0.84 and **an improvement in its managed net credit loss rate to below the second quarter rate of 10.29%.**  At the currently expected loan growth levels, it is likely that the fourth quarter managed net credit loss rate will be between 10.45% and 10.75%. The Company's anticipated loan growth and mix will likely result in the managed net credit loss rate for 2002 remaining at or above the fourth quarter 2001 level.  The Company plans to add $50 to $75 million to its loan loss reserve during the balance of 2001.

**"Providian remains highly profitable with solid returns on assets and equity and a very strong balance sheet,"** said Shailesh J. Mehta, chairman and chief executive officer.   "Even though we **expect to maintain industry leading profitability per account, based on our growing scale and our objective of optimizing the balance between risk and growth, we believe 15% earnings per share growth is an appropriate long-term goal.**  While it is too early to have a refined view of 2002, it is expected that earnings per share performance will be lower than our long-term goal."

* * *

**The Company also commented on the change made to its process for recognizing charge-offs resulting from consumer bankruptcies.  For improved operational efficiency, the Company now batches electronic bankruptcy notifications and charges off the related amounts once per month.  The change resulted in a portion of bankruptcies, for which notification was received on or after June 18, 2001, being charged off in July.  Because the Company's loan loss reserves provided for estimated bankruptcies received but not yet charged-off, the change had no impact on second quarter earnings.  For the quarter ended June 30, 2001, adjusting for the processing change, the managed net credit loss rate of 10.29% and the managed 30+day delinquency rate of 8.04% were 10.63% and 7.99%, respectively.**

(Emphasis added).

93.    The Company admitted to the policy change only after analysts disclosed the truth.  In response to the Company's disclosure, the price of Providian's stock dropped from $39.06 to $30.36.  By stating that the change had no impact on Second Quarter earnings and by omitting facts that undermined the accuracy of the Company's financial projections, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Providian stock, one of the Plan investment options, and breached their duty to monitor Providian stock and ensure that it was a prudent investment for the Plan.

94.    On September 7, 2001, Defendants met with Mark Alpert and other representatives of Deutsche Bank Alex Brown at Providian's San Francisco headquarters and admitted that they should have been more up-front about the change in bankruptcy policy. Nevertheless, Defendants continued to maintain that Providian **would achieve $0.83 earnings per share in the Third Quarter of 2001.**  At the time Defendants affirmed the Company's earnings guidance, Defendants were silent about the following: (1) the loss rates were at a crisis level; (2) the Company had failed to provide and adjust its reserves in an amount of at least $180 million; and (3) the Company could not achieve $0.83 EPS in Third Quarter 2001.  Through their silence, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Providian stock, one of the Plan investment options, and breached their duty to monitor Providian stock and ensure that it was a prudent investment for the Plan.

95.    On October 11, 2001 after the close of the market, and a mere month after confirming its Third Quarter earnings projections, Defendants announced Providian's preliminary results for the Third Quarter of 2001 in a press release that stated, in pertinent part:

> Providian Financial Corporation (NYSE: PVN) today reported it expects third quarter earnings to be lower than previous guidance of $0.82 to $0.84 per diluted share.  The Company cited three primary factors: actions to strengthen the balance sheet in anticipation of continued weak credit conditions, lower than expected fee and finance charge revenue in September, and higher than expected credit losses in September.  Actions to strengthen the balance sheet include an incremental loan loss provision of approximately $186 million and a charge of approximately $85 million

to recognize the estimated uncollectible portion of accrued finance charges, and to increase the estimate of uncollectible fees, on accounts which are 90+ days delinquent. Previously, these finance charges and fees were reversed against current revenue upon charge-off of the related account. The results also include a $23 million gain from the early extinguishment of debt. Based on preliminary numbers, the Company now expects earnings to be in the range of $0.19 to $0.21 per diluted share. The managed net credit loss rate is expected to be approximately 10.33% for the quarter.

The Company will announce its third quarter results and revised guidance for the fourth quarter on October 18th after the close of the market. Until that release, the Company does not plan to provide further updates.

(Emphasis added).

96.     In the October 11, 2001 press release, Defendants did not disclose complete and accurate information because:

(a)     Providian's net charge-off rate for the Second Quarter was materially understated, and loss curve projections indicated a net credit loss rate of 12-13% or higher;

(b)     Charge-offs would not decline in Third Quarter 2001 because Defendants had already secretly pushed 12 days of charge-offs into the third quarter;

(c)     By manipulating the treatment of its bankruptcy filings, Defendants deferred the recognition of approximately $24 million in charge-offs from June (the Second Quarter) to July (the Third Quarter), which shaved 34 basis points from the Company's true net charge-off rate and artificially inflated its Second Quarter EPS by $0.05;

(d)     Providian failed to disclose that it had changed its lending criteria to extend more credit into the sub-prime and middle market segments, despite the fact that these were precisely the segments of the market that increased risk during an economic downturn;

(e)     Defendants failed properly to provide, reserve, and adjust for loan losses in the Second Quarter in the material amount of approximately $180 million; and

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 32

1      (f)     In light of the above, Defendants did not have a reasonable basis for representing

2      that they would achieve Third Quarter 2001 EPS of $0.83.

3      97.     Through these misrepresentations and omissions, Defendants breached their

4  fiduciary duty to disclose complete and accurate information regarding Providian stock, one of

5  the Plan investment options, and breached their duty to monitor Providian stock and ensure that

6  it was a prudent investment for the Plan.

7      98.     Even though Defendants hid the <u>full</u> extent of Providian's financial distress, the

8  partial disclosure shocked the market and caused Providian's stock price to fall from $20.35 to

9  $13.45 on trading volume of over 25 million shares.

10  **C.**    **False and Misleading Statements Issued Directly to Plan Beneficiaries and
Participants**

11

12      99.     In addition to the above referenced disclosures, Providian and certain of the

Individual Defendants, regularly communicated with Providian employees, including

13  participants in the Plan, about Providian's financial performance, stock price and its future

14  financial and business prospects.  Two of the forums in which these communications occurred

15  were the in-house publication called "Pro-Log" and internal Company press releases.  These

16  communications also occurred during quarterly Upper Management Leadership Meetings, during

17  regular Sales Manager/Team Leader Meetings, and during the weekly staff meetings.  At the

18  weekly staff meetings Defendants Mehta, Alvarez and other top executives consistently

19  represented to employees that Providian's financial situation was strong and that Providian's

20  stock was a good investment and they should participate in the Saving Plan.  Defendants

21  breached their fiduciary duties of loyalty and prudence in these communications with employees

22  by failing to disclose complete and accurate information about Providian Stock, one of the

23  investment options in the Plan.

24      100.    These promotional statements were made by Mehta, Alvarez and other Providian

25  officers and/or directors for the purpose of encouraging Plan participants to invest in Providian

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 33

1    stock, and discouraging Plan participants from liquidating the amounts they already had invested

2    in Providian stock.  Defendants made such statements for several reasons, including the fact that

3    shares owned indirectly by the Plan, through its investment in the Providian Financial Stock

4    Plan, consisted of a large block of stock that was likely to be voted in accordance with

5    Providian's management's wishes.  Additionally, participants' purchase of the Plan stock created

6    extra demand for Providian stock and thus helped increase the market price for Providian stock,

7    which was another objective of the Providian Insider Defendants.

8        101.    These representations were made in the context of a Company which had told its

9    employees that, "the opportunity and responsibility for success, however, lie with each of us as

10   Providian employees.  Part of that responsibility requires that we preserve and strengthen the

11   legal and ethical foundation of our Company."  Providian employees were to be guided by a

12   "legal and ethical foundation."  This mandate was set forth in Providian's "Corporatewide

13   Policies," a handbook provided to all employees, which instructed all Providian employees to act

14   "honestly and with integrity":

15           Providian expects employees to act honestly and with integrity in every
             aspect of their job.  This includes reporting business irregularities that
16           come to their attention.

17                                          * * *

18           Employment with Providian places an ethical and legal obligation on
19           employees to put the best interests of Providian ahead of conflicting
             business, employment, or personal interests.

20       102.    Further, the Corporatewide Policies represented that the Individual Defendants,

21   and others, would not engage in transactions that resulted in conflicts of interest:

22
             It is important for all employees, without regard to position or individual
23           situation, to recognize the potential for conflicts of interest to arise.  Each
             employee is expected to take responsibility to act for the Company's
24           benefit, both short- and long-term.

25

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 34

103.   Employees thus reasonably expected that the Defendants who were urging them to have confidence in the Company and its stock price were being candid, honest and fair in the statements made to them about Providian, its finances and Providian stock, i.e., upholding their fiduciary duties of prudence and loyalty.

104.   After setting the rules that the Company would be honest and obey all laws, Mehta and other of the Individual Defendants continuously recommended to employees that they invest in Providian, as described below.

105.   In June 28, 2000, Providian announced they had reached a $300 million settlement with the Office of the Comptroller of the Currency (OCC), the San Francisco District Attorney's office and the California Attorney General regarding Providian's business practices. After this announcement, Mehta told employees the Company was doing well and to "put their dollars in a billion dollar company."  In the Company announcement Mehta stated:

> Today, we are emerging as a stronger and more customer-focused company.  We have improved customer retention, achieved high levels of customer satisfaction as we plan to build on this momentum to ensure that Providian is a world-class business in every respect.

106.   A mid-2000 issue of "Pro-Log" stated the Company was doing "fine."  Also during this period, Senior Managers and Benefits Managers distributed flyers and internal memos stating the Company was in "good standing."

107.   On July 20, 2000, when the Company announced its second quarter results, Mehta represented that Providian's success would result in employee rewards:

> As Providian continues its focus on enhanced customer satisfaction initiatives first implemented over one year ago, we are seeing the results in the form of continued record revenue and high customer retention levels. More importantly, we believe that our focus on being best in class in customer service combined with our investments in ongoing newer business initiatives will continue to reward Providian's customers, shareholders and employees and provide a long term competitive advantage.

108.    In October 2000, at a Providian employee meeting held in Sacramento, the head of the Sales/Marketing Department presented Providian's third quarter results to the Sacramento employees.  She stated that although credit card losses were high, the "Company stock was still a good value."  In response to her statement regarding the losses, the Sacramento Site Manager told employees that the Company had "so much cash that it could handle these losses."

109.    In a January 18, 2001 Company press release, Providian announced 44% earning per share growth for the year 2000 before one-time adjustments.  Mehta stated: "Our employees' dedication and hard work in making Providian an industry leader in customer satisfaction was a major factor in our success this year.  As we enter 2001 in what will likely be a challenging economic climate, we are proud to reaffirm out long term earnings per share goal of 25%."

110.    Mehta's statements contributing the success of the Company to the employees were further reiterated by upper management, who encouraged Sales Managers/Team Leaders to prompt the employees at their weekly meetings to buy Providian stock.  Upper management was told to tell employees that buying Company stock was a way of showing pride and ownership in the Company.

111.    On April 27, 2001, Mehta continued to tout the importance of Providian's employees to the Company's success.  In announcing the new Chief of Human Resources, Mehta said, "Providian's most important assets are our employees."  Mehta made statements about the importance of the employees to Providian's success and the upward momentum of the Company to encourage employees to participate in the Plan and become owners in the Company.

112.    As noted above, in early and mid-June 2001, Defendants were scrambling to find ways to meet their projected Second Quarter results.  On June 18, 2001, without notification to employees, the Company changed from its publicized policy and practice of immediately writing off receivables for customers who had filed for bankruptcy protection to "batch processing."

113.    In July and August 2001, Company stock was mentioned to employees at their weekly staff meetings and employees were told "not to worry, that nothing was wrong."  By

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 36

1  failing to disclose the change for bankruptcy charge-offs, Defendants breached their fiduciary

2  duty to disclose complete and accurate information regarding Providian stock, one of the Plan

3  investment options, and breached their duty to monitor Providian stock and ensure that it was a

4  prudent investment for the Plan.

5        114.    What the employees were not told was that Mehta had sold 85,000 of his shares

6  and realized a profit of approximately $3.8 million and Alvarez had sold nearly 400,000 of his

7  shares realizing proceeds of nearly $18 million.

8        115.    In fact, Mehta and Alvarez sold their Company stock immediately after the lock-

9  out period, which prohibited senior executives from trading subsequent to the second quarter

10  earnings announcement.  These transactions also occurred before the Company announced the

11  change in the way it was handling charge-offs from consumer bankruptcies, and after Mehta

12  encouraged employees to have confidence in Providian's stock by making positive statements

13  about the Company's strength in press releases.  By conducting these transactions, these

14  fiduciaries breached their fiduciary duty to avoid conflicts of interest.  They put their self-interest

15  before the interests of the plan participants, to whom they owed fiduciary duties.

16        116.    In the Fall of 2001, the workload slowed at the Sacramento site.  Upper

17  management told the employees that new programs would be coming out, and that there would

18  not be a temporary lay-off because a layoff would be perceived poorly by shareholders.

19        117.    As detailed below, the bad news began to emerge regarding Providian's Financial

20  Condition on October 18, 2001, when the Company announced third quarter results.  Also on

21  October 18, 2001, the Company announced its 5-Point Strategic Action Plan, designed to address

22  the increase in net credit losses.

23        118.    In response to the implementation of the Strategic Action Plan, upper

24  management was told to tell all employees that the 5-Point Plan was to "pull the Company back

25  together."  Upper management was told to bring their teams together and convey the plan to the

26  employees by the end of the day.

119.    Prior to the price of the stock dropping on October 19, 2001, employees received an internal e-mail on ProNet, Providian's Online Manager Question and Answer communication, which contained information regarding a potential drop in the price of Providian stock. Employees were told this drop would be "temporary" and that the stock would "rebound."

120.    On October 19, 2001, after the price of Providian stock dropped from $12.40 per share to $5.15 per share, employees were encouraged to hold onto their Providian stock. At management meetings, managers were told that Providian had $5 billion in cash and were asked, in a rhetorical fashion, "do you think we are going broke?" Managers were told that brokers were causing the Company's problems and trying to drive the price of the stock down. They were told that the Company was "strong and stable," and they were encouraged to tell the staff "not to worry," that they were in control and everything was fine.

121.    In the communications described above, Defendants encouraged participants to buy and maintain Providian shares in the Plan, at a time when investing in Company stock was not wise. Though these communications, Defendants breached their fiduciary duty to disclose complete and accurate information regarding Providian stock, one of the Plan investment options, and breached their duty to monitor Providian stock and ensure that it was a prudent investment for the Plan.

**D.    The Truth Is Revealed**

122.    On October 18, 2001, Defendants announced Providian's dismal results for the Third Quarter of 2001 in a press release that provided:

> Providian Financial Corporation (NYSE: PVN) today reported results for its quarter ended September 30, 2001. The Company also outlined details of its action plan to improve the Company's risk profile and long-term earnings. It also announced, separately, the resignation of Shailesh J. Mehta as Chairman. Third Quarter Financial Results For the third quarter 2001, the Company reported net income of $57.2 million or $0.20 per diluted share including a gain of $23 million, or $0.05 per share, realized from the early extinguishment of debt. This compares to net income of $200.7 million, or $0.68 per diluted share, for the third quarter 2000.

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 38

These results reflect actions the Company has taken to strengthen the balance sheet including: 1) an incremental provision for loan losses of $186 million, and 2) a charge of $85 million to recognize the uncollectible portion of accrued finance charges, and to increase the estimate of uncollectible fees on accounts that are 90+ days delinquent. The results also reflect lower than expected fee and finance charge revenue and higher than expected net credit losses in September 2001.

The Company added more than 800,000 net new accounts bringing total accounts to 18.5 million, a 23% increase over the end of the third quarter of 2000. Managed loans increased by $1.8 billion during the quarter bringing total managed credit card loans to $32.2 billion, a 31% increase over the third quarter of 2000.

Managed revenue totaled $1.7 billion, a 24% increase over the third quarter of 2000. Managed net interest income was $1.0 billion and managed non-interest income was $702.2 million, an increase of 33% and 13% over the third quarter of 2000, respectively. The managed net interest margin on loans was 12.94% in the third quarter, compared to 12.90% in the third quarter 2000, and would have been 13.75% in the third quarter 2001 had the adjustment to recognize the uncollectible portion of accrued finance charges been excluded.

The managed net credit loss rate for the third quarter was 10.33%, versus 10.29% in the second quarter of 2001. The 30+ day delinquency rate increased to 8.66% from 8.04% in the second quarter, and would have been 8.90% excluding the adjustment to recognize the uncollectible portion of accrued finance charges and fees. **The ratio of loan loss reserves to balance sheet loans increased to 12.00% at September 30, 2001**, from 10.55% at June 30, 2001 after the $186 million incremental provision.

Risk-adjusted return was 11.88%, return on managed assets was 0.62%, and return on equity was 9.40% for the quarter.

123.    Providian revealed what was true throughout most of 2001 – that Providian was a Company in crisis. These revelations caused the price of Providian's stock to fall to $5.15 per share, down almost 60% from the preceding day and more than 90% from the Class Period high of $59.80 per share. Amazingly, over 69 million shares of Providian common stock changed hands in a single day - more than any other stock in the United States. Ultimately, Providian was the S&P Index's worst performer in 2001, falling 94% by the end of the year.

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 39

1    124.   In its October 18, 2001 press release, Providian also announced the resignation of

2   CEO and Chairman Mehta and the Company's "Strategic Action Plan" to improve the

3   Company's risk profile and long-term earnings.  Under the new plan, the Company indicated it

4   would, among other things, suspend lending to the highest risk segments of the standard market

5   and reduce line of credit increase programs in higher loss segments.

6    125.   After speaking with David Petrini, the Associated Press reported in an article

7   dated October 18, 2001 that "management worsened the losses by raising the credit limits of its

8   high-risk customers even as the economy deteriorated." Defendants failed to disclose these

9   changes during the Class Period, thereby breaching the fiduciary duty owed to Plan participants

10   to disclose complete and accurate information regarding Company stock.

11    126.   Petrini told the San Francisco Chronicle (in an article dated October 19, 2001):

12
13
> Certain segments of the market have proved to be more volatile than we
> have predicted, especially when strained by the economic environment.
> **In some cases, volatility has been exacerbated by credit line increase
> offers, even in segments that seemed to be showing disproportionate
> effects of the economic downturn.**

14
15   (Emphasis added).

16    127.   Petrini also admitted that the Company's financial state was so precarious that it

17   might be sold, saying, "all options are on the table right now." He also acknowledged that layoffs

18   were possible.

19    128.   In four steep, high-volume drops, each on days when further revelations of

20   Providian's true financial condition reached the market, the stock fell from more than $43 per

21   share in August, to less than $30 on September 5, to just over $5 following the final revelation in

22   October.  Providian stock fell $38.50 per share, or 88%, from the time the disclosure of

23   Providian's accounting change was made to the Company's final admission of the dimensions of

24   the crisis.  Defendants thus failed in their fiduciary duty to ensure that Providian stock was a

25
26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 40

1    prudent investment in the Plan, by allowing participants to continue to make and maintain
2    Providian shares in their Plans.

3        129.    Mehta, Alvarez, Rowe, and Petrini all resigned in the wake of disclosures of
4    Providian's true imperiled financial condition; reported loss rates in excess of 12%; questions
5    about management credibility; and a disastrous decline in the Company's stock price.  In
6    October 2001, J. David Grissom, an outside Board member, assumed Mehta's role as Chairman
7    of the Board, and Mehta agreed to continue as chief executive until the Company named a
8    successor.

9        130.    According to a former Executive Administrative Assistant at Providian, just
10   before the Christmas and New Year's holidays in 2001, at Mehta's direction, she shredded files
11   belonging to Mehta's direct reports, internal memoranda, and his handwritten notes.  She also
12   described Mehta as taking approximately four boxes of personal files and documents with him as
13   he departed the Company.  Mehta's unlawful spoliation of evidence during the time when at least
14   fifteen lawsuits were pending against him and the Company demonstrates that Defendants were
15   likely to have been threatened by the evidence Mehta intentionally destroyed.  Plaintiffs are
16   entitled to a strong inference that the shredded documents would have established that Mehta and
17   the other Defendants breached their fiduciary duties to disclose complete and accurate
18   information by massively understating Providian's loss rates, loan loss reserves, and provisions
19   and by changing, without disclosure, the way it accounted for bankruptcy charge-offs to defer
20   material losses from Second to Third Quarter 2001.  Additionally, Plaintiffs are entitled to a
21   strong inference that the shredded documents would have established that Defendants breached
22   their duty to avoid conflicts of interest by artificially inflating Providian's stock price for
23   Defendants' own benefit.

24       131.    In March 2002, Warren Wilcox, Providian's Vice Chairman of Planning and
25   Marketing, spoke at a Banc of America Securities Financial Services Conference and admitted
26   that the Company had, from late 2000 and into 2001, engaged in an "overly aggressive credit line

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 41

1   increase program and at the same time the infrastructure development really was not keeping

2   pace with growth..." He further admitted that the Company had continued to go "deeper and

3   deeper into the sub-prime market and into some of the deeper strata of that market."

4   **E.     False Financial Statements**

5         **(a)     Violations of GAAP and SEC Reporting Requirements**

6         132.    To maintain its stock price and overstate its earnings in 2001, Providian violated

7   both the Generally Accepted Accounting Principles ("GAAP") and the Securities and Exchange

8   Commission ("SEC") reporting requirements by failing properly to state assets and income

9   statement amounts in its financial statements for the Second Quarter and the six-month period

10  ended June 30, 2001.  Providian also failed to make adequate GAAP and SEC disclosures in the

11  same financial statements filed for the Second Quarter and six-month period ended June 30,

12  2001.  These financial statements and the statements about them failed to fairly present that the

13  Company's operations and financial resulted in violations of GAAP and the SEC rules.  Through

14  these statements, Defendants breached their fiduciary duty to disclose complete and accurate

15  information regarding Providian stock, one of the Plan investment options, and breached their

16  duty to monitor Providian stock and ensure that it was a prudent investment for the Plan.

17        133.    Specifically, in order to overstate Providian's assets, revenues, net income and

18  earnings per share, and present materially false financial statements during the Class Period,

19  Defendants caused the Company to violate GAAP and SEC rules, in numerous ways, including,

20  but not limited to:

21        (a)    Overstating income by materially understating loan loss provisions;

22        (b)    Improperly manipulating and inflating earnings per share by overstating income;

23        (c)    Materially overstating revenue by failing to accrue for uncollectible fees and

24              finance charges;

25        (d)    Overstating assets by materially understating loan loss reserves;

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 42

(e)     Failing to disclose material accounting changes in bankruptcy loss recognition procedures, which affected comparability of loss rates between two or more periods.

134.    The aforementioned statements are violations of GAAP, which automatically are violations of SEC rules under Regulation S-X (17 C.F.R. § 210.4-01(a)(1)). Regulation S-X provides that financial statements filed with the SEC that are not prepared in accordance with GAAP are presumed to be misleading and inaccurate.  Under Regulation S-X, interim financial statements, like quarterly statements filed on Form 10-Q, also must comply with GAAP and must be accurate and include disclosures so as to make the information presented not misleading. (S-X Rule 10-01(a)(5), 17 C.F.R. § 210.10-01(a)).

135.    Providian overstated assets, revenue, and income when it reported on the activity of the securitized (or Managed) part of the loan portfolio in the Form 10-Q it filed with the SEC on August 14, 2001 for the Second Quarter of 2001.  This overstatement was ultimately evidenced by the subsequent revision in the Second Quarter loss rate numbers Providian reported on September 4, 2001 in a press release.  This release revised the loss rate of the Managed portfolio from 10.29% to 10.63%.  This is well above Defendants' guidance of 9.5-10% for Second Quarter.  Defendants made no mention of this change its in Form 10-Q or on its conference call with analysts to discuss Second Quarter operations and earnings results.

136.    The overstatement of assets, revenue, and income occurred when Providian failed to accrue an adequate expense for loan losses related to the securitized portfolio after it secretly changed its revenue recognition methodology with regard to bankruptcy filings made by credit card customers, as well as the uncollectible fees and finance charges.  Providian disclosed a provision for credit losses on a managed basis of $380,829,000 in its Segment footnote (note 9) under the caption "Securitization Adjustment" in the Second Quarter 10-Q filed in August of 2001.  This amount was part of the total Managed loss provision of $758,921,000 (also disclosed in footnote 9), which comprised the reported annualized loss rate of 10.29%.  The loss provision

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 43

1   amount for securitizations was understated by over $24,000,000, if the revised credit loss rate

2   provided by Providian on September 4, 2001 was accurate, and by a significantly larger amount

3   if the Company's true loss rate was 12-13% or higher.

4       137.    The understatement in the loss provision served to overstate income and

5   understate liabilities, both by at least $24,000,000.  The impact on earnings was to overstate EPS

6   by approximately $0.05 per share.

7       138.    Because of the fiduciary duty to act solely in the interest of the Plan participants,

8   the Defendants, who were the only people privy to this information, breached not only their duty

9   to disclose complete and accurate information, they also breached their duty to avoid conflicts of

10  interest by benefiting from the inflated value of Providian stock.

11          **(b)     Violation of GAAP by Failing to Recognize Loss Contingencies**

12      139.    Providian also undervalued its liabilities when it failed properly to recognize a

13  loss contingency under Financial Accounting Standard No. 5 – Accounting for Contingencies

14  ("FAS 5").  FAS 5 provides guidance as to the recognition of losses in the appropriate fiscal

15  period.  It stems from the concepts of conservatism and matching.  Specifically, FAS 5 defines a

16  contingency in paragraph 1 in the following way: "For purposes of this statement, a contingency

17  is defined as an existing condition, situation, or set of circumstances involving uncertainty as to

18  possible gain or loss to an enterprise that will ultimately be resolved when one or more future

19  events occur or fail to occur." The filing of bankruptcy by Providian's credit card customers is

20  considered a loss contingency.

21      140.    Loss contingencies such as bankruptcy filings should be recognized and reported

22  under paragraph 8 of FAS 5 when:

23          (a)     Information available prior to the issuance of the financial
                    statements indicates that it is probable that an asset has been
24                  impaired or a liability has been incurred …; and

25          (b)     The amount of the loss can be reasonably estimated.

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 44

1   Thus, Providian should have booked a charge to income for undisclosed Second Quarter
2   bankruptcy filings because it was probable that its loan portfolio was impaired to the extent of
3   the bankruptcies, and Providian could have (and in the past, did) reasonably estimate the amount
4   of the losses.

5   141.   The SEC considers disclosures of loss contingencies to be so important to
6   accurate financial reporting that it promulgated Regulation S-X (17 C.F.R. § 210.10-01), which
7   allows interim financial statement disclosures to be abbreviated except when "material
8   contingencies exist, disclosure of such matters shall be provided even though a significant
9   change since year end may not have occurred."

10   142.   Providian also failed to follow GAAP by not disclosing the change in
11   methodology for recognizing bankruptcies.  Regulation S-X (17 C.F.C. § 210.10-01(a)(5))
12   requires disclosure for events having a material impact occurring since the end of the most recent
13   fiscal year.  The Regulation continues that disclosure will encompass significant changes such as
14   "estimates in inherent in the preparation of financial statements."  With the change in the
15   methodology in the reserving for bankruptcies, the nature of the accrual changed, and thus, this
16   change should have been disclosed in the financial statements in which the change was made
17   (i.e. the Second Quarter of 2001).  Providian merely stated the new policy in a non-
18   distinguishing way, without comparison or reference to the old policy, and without disclosing the
19   pro-forma impact.

20   143.   Defendants' failure to disclose complete and accurate information to Plan
21   participants regarding their loss contingencies was a breach of their fiduciary duty.

22   **(c)   Failure to Follow Accrual Accounting Methods**

23   144.   Providian failed to follow accrual accounting methods as described in Financial
24   Accounting Concepts 6 – Elements of Financial Statements, paragraph 139.  This section defines
25   the concept of accrual accounting, i.e., to match expenses with the proper accounting period.
26   This concept paired with the need for the recognition of asset impairment under FAS 5 mandates

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 45

1    that losses be recognized in the current period and not deferred. Deferring the recognition of the

2    bankruptcies does not conform to the concept of accrual accounting as Providian failed to

3    recognize the loan impairment in the period in which the impairment became known, the Second

4    Quarter. With the knowledge that expenses were not being matched with the proper accounting

5    period, Defendants knew that Providian stock was not a prudent investment for the Plan.

6    Defendants, however, breached their fiduciary duty of monitoring Providian stock and ensuring

7    that it was a prudent investment for the Plan, by allowing participants to continue to investment

8    in Providian stock.

9              **(d)    Failure to Adequately Expense and Reserve for Loan Losses**

10          145.    In furtherance of their scheme to misrepresent Providian's operating results and

11   financial well being, Defendants failed to adequately reserve both the Reported and Managed

12   loan portfolios in the Second Quarter of 2001. In the two quarters following the Second Quarter

13   of 2001, loan charge-offs, the Reported Loan Loss Provision, and the Loan Allowance Reserve

14   each increased significantly. Part of the increase in the allowance and charge-offs in the latter

15   part of fiscal 2001 was due to the under-reserving and under-expensing of loan losses in the

16   Second Quarter of the year. Defendants failed adequately to reserve and expense for loan losses

17   in violation of GAAP, notwithstanding Defendants' knowledge of Providian's seriously

18   deteriorating financial condition.

19          146.    The Second Quarter of 2001 saw only a marginal increase in the Reported loss

20   allowance of 0.3% from the First Quarter. However, the Third Quarter experienced a 12.2%

21   increase in the allowance from the Second Quarter and the Fourth Quarter saw a 12.8% increase

22   from the Third Quarter allowance. These increases took place at the same time that the total

23   Reported receivables decreased by 0.17% from the First to the Second Quarter; by 1.12% from

24   the Second Quarter to the Third Quarter; and by 9.4% from the Third Quarter to the Fourth

25   Quarter.

26

147.   On September 4, 2001, Providian announced that "The Company plans to add $50 to $75 million to its Loan Loss Reserves during the balance of 2001." Providian made this announcement because its loss allowance and reserves were not adequate and additional reserves were necessary to align the carrying value of the loan portfolios with collectibility.  Part of the addition applied to reserves for Second Quarter losses.

148.   Shortly after issuing the September 4, 2001 press release, Providian disclosed in another press release dated October 11, 2001 that it would take "actions to strengthen the balance sheet include an incremental loan loss provision of approximately $186 million and a charge of approximately $85 million to recognize the estimated uncollectible portion accrued finance charges, and to increase the estimated of uncollectible fees, on accounts which are 90+ days delinquent." The same press release continues: "Previously, these finance charges and fees were reversed against revenue upon charge-off of the related account." This is an additional change in methodology which would have had an impact in the Second Quarter as the securitized write-offs were deferred with the change to batch processing.  As the write-offs were deferred, so was the reversal of already recognized finance charges and fee income.

149.   Based on estimates from financial figures Providian disclosed in early September and October 2001, the Company understated its Loan Loss Provision and Loan Allowance and materially overstated income for the Second Quarter and six-month period ended June 30, 2001 by approximately $124 million.

150.   Also based on estimates from financial figures Providian disclosed in early September and October 2001, with regard to the failure to accrue in Second Quarter for uncollectible fees related to charge-offs, the Company materially overstated income for the Second Quarter and six-month period ended June 30, 2001 by approximately $56.6 million.

151.   Providian disclosed, in a press release dated February 7, 2002 (relating to the fiscal period ending December 31, 2001), a $252 million addition to the allowance for loan losses, bringing aggregate reserves to over $1.9 billion.  While the economy had slowed in the

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 47

1  Fourth Quarter of 2001, this large catch-up increase is merely a continuation of the Third Quarter
2  increases to reserves, and further evidences the inadequate loan loss reserves maintained by
3  Providian during the Class Period.

4      152.    The undisclosed adverse financial information concealed by Defendants during
5  the Class Period is the type of information that, because of SEC and other regulations and
6  customary business practices, is expected by analysts and investors, including employee
7  investors, to be disclosed.  It is information that is known by corporate officers and directors and
8  their financial and legal advisors to be the type of information that is expected to be and must be
9  disclosed.  As a result of the accounting manipulations noted above, and its failure to comply
10  with GAAP, Providian was able to falsely report earnings that exceeded analysts' estimates
11  during the Class Period.  Ultimately, Providian's undisclosed change in its bankruptcy
12  recognition policy and procedures combined with the overstatement of income and
13  understatement of liabilities served to undermine the public's confidence in Providian's
14  management and management's projections, and caused the market price of Providian's stock to
15  fall from $56.75 to $5.15 per share during the four-month period of June 6, 2001 to October 18,
16  2001.

17      153.    By failing to disclose this adverse financial information, Defendants breached
18  their fiduciary duty to disclose complete and accurate information regarding Providian stock, one
19  of the Plan investment options, and breached their duty to monitor Providian stock and ensure
20  that it was a prudent investment for the Plan.

21  **F.    Certain Defendants also Reaped Millions from Their Insider Trading**

22      154.    According to the Company's 2001 Proxy Statement, the Company provided
23  grants of stock options under the Company's Stock Incentive Plan to Defendants Mehta,
24  Alvarez, Petrini and Rowe.  These option grants "tie awards to the future performance of the
25  Company's common stock by providing value only when the price of the Common Stock
26  increases above the exercise price." The Company's Proxy Statement indicates that the stock

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 48

1    option grants are "intended to motivate executives to improve the long-term performance of the
2    Company's stock."

3        155.    During 2000, Defendants Mehta, Alvarez and Rowe were granted approximately
4    1,000,000; 300,000; and 220,000 shares of Providian stock, respectively, under the Company's
5    Stock Incentive Plan.  The exercise or "strike" price of these options was set at $40.94 per share.

6        156.    These Defendants were motivated to pursue an illegal scheme in furtherance of a
7    common goal, i.e., inflating the reported profits of Providian and the trading price of Providian
8    stock and to meet performance-based targets set for the Company and themselves.  They had an
9    incentive to exercise options while the options were "in the money" and sell their own shares of
10   Providian stock at artificially inflated prices while in possession of material non-public adverse
11   information regarding the Company's soon to be reported financial status.

12       157.    Taking advantage of the artificially inflated price of Providian stock during the
13   Class Period, Defendants Mehta, Alvarez and Rowe collectively sold 492,964 shares of
14   Providian stock, reaping proceeds in excess of $22 million.

15       158.    The illegal insider selling escalated massively as Providian stock moved to more
16   inflated levels during the Class Period and also when it became clear that the Company would
17   not be able to meet its projected earnings figures.

18       159.    By conducting these "Insider Trading" transactions, Defendants Mehta, Alvarez,
19   and Rowe breached their fiduciary duty to Plan participants to avoid conflicts of interest.  They
20   placed their self-interest before the interests of the Plan participants, to whom they owed their
21   fiduciary duty.

22           **(a)    Defendant Alvarez's Illegal Insider Trading**
23       160.    According to the Proxy Statement, as of March 12, 2001, Defendant Alvarez
24   owned approximately 32,854 shares of Providian stock.  Additionally, during 2000, Alvarez was
25   awarded 66,745 restricted shares and 717,902 options granted under the Company's Stock
26   Incentive Program.

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 49

161.    On the following dates during the Class Period, Defendant Alvarez exercised options and sold stock, reaping $17,908,702 in illegal insider trading proceeds, thereby breaching his fiduciary duty to avoid conflicts of interest:

| Date | Transaction | Shares | Price Per Share | Proceeds |
|------|-------------|--------|-----------------|----------|
| 07/24/2001 | Sale | 50,000 | $48.23 | $  2,411,500.00 |
| 07/25/2001 | Sale | 10,787 | $46.94 | 506,341.78 |
| 07/25/2001 | Sale | 50,000 | $47.00 | 2,350,000.00 |
| 07/25/2001 | Sale | 50,000 | $47.01 | 2,350,500.00 |
| 07/26/2001 | Sale | 20,512 | $47.00 | 964,064.00 |
| 07/26/2001 | Sale | 178 | $48.05 | 8,552.90 |
| 07/26/2001 | Sale | 50,000 | $47.64 | 2,382,000.00 |
| 07/27/2001 | Sale | 52,200 | $48.00 | 2,505,600.00 |
| 08/07/2001 | Sale | 2,097 | $49.05 | 102,857.85 |
| 08/15/2001 | Sale | 67,190 | $45.45 | 3,053,785.50 |
| 09/06/2001 | Sale | 45,000 | $28.30 | 1,273,500.00 |
| **TOTAL SOLD** | | **397,964** | | $17,908,702.03 |

162.    Alvarez's Class Period sales far exceeded his pre-Class Period sales and Defendant Alvarez's Illegal Insider Trading Transaction Shares were dramatically out of line with his prior trading practices.  During the pre-class period from June 2000 to May 2001, Alvarez sold fewer than 30,000 shares of Providian stock.  In contrast, during the 4-month period preceding Providian's devastating announcement of their third quarter results on October 18, 2001, Alvarez sold nearly 400,000 shares totaling nearly $18 million.

163.    Alvarez's erratic trading during the period of June through September 2001 represents a substantial departure from his prior trading history.  In late July 2001, Alvarez exercised 252,378 vested stock options and the same day, sold all 252,378 shares at the trading price of $36.94-$48.23 per share, reaping proceeds of nearly $13.5 million.  Two weeks later, on August 15, 2001, Alvarez exercised 67,190 stock options, and sold them the same day for over $45 per share, reaping proceeds of over $3 million.  In July and August, bankruptcy filings were

1   mounting, and Alvarez knew that he and others manipulated the Company's net credit loss rate

2   by implementing undisclosed policy and procedural changes. Several weeks later, as it became

3   abundantly apparent to him and other senior managers that the Company would not be able to

4   meet its projected earnings figures, Alvarez exercised 45,000 options and on the same day sold

5   the entire amount of shares for nearly $1.3 million.

6       164.    Alvarez's Class Period sales – nearly half of his holdings -- are unusual and

7   suspicious compared to his prior trading history and were calculated to maximize his own

8   personal benefit from undisclosed insider information concerning the Company's secret change

9   in its method of reporting bankruptcies, escalating loss rates, and undisclosed changes in

10  underwriting credit requirements and credit line extension policies.

11          **(b)    Defendant Mehta's Illegal Insider Trading**

12      165.    Defendant Mehta also took advantage of his and others' false statements and

13  omissions and the artificial inflation of the Company's stock caused thereby and sold 85,000

14  shares of Providian stock at artificially inflated prices as high as $56.75 per share, reaping illegal

15  insider trading proceeds of more than $3.8 million during the Class Period.

16      166.    As of March 12, 2001 Mehta owned approximately 521,689 shares of Providian

17  stock. Mehta was the highest paid executive at the Company from 1996 through 2000, earning a

18  salary of $955,962, a bonus of $1,371,103, restricted stock awards of $3,912,378 and options for

19  6,306,350 shares granted under the Company's Stock Incentive Program.

20      167.    On the following dates during the Class Period, Defendant Mehta sold shares of

21  Providian stock, thereby breaching his fiduciary duty to avoid conflicts of interest:

| Date | Transaction | Shares | Price Per Share | Proceeds |
|------|-------------|--------|-----------------|----------|
| 07/24/2001 | Sale | 75,000 | $49.0773 | $ 3,680,797.50 |
| 07/25/2001 | Sale | 10,000 | * | 183,124.30 |
| **TOTAL SOLD** | | **85,000** | | **$ 3,863,921.80** |

    *       Listed on Form 5 as a Bona Fide Gift Transaction.

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 51

(c)    **Defendant Rowe's Illegal Insider Trading**

168.    As of March 12, 2001, Defendant Rowe owned approximately 31,117 shares of Providian stock. During 2000, Rowe was granted 19,638 shares of restricted stock and 336,668 options under the Company's Stock Incentive Program. During the Class Period, Defendant Rowe took advantage of his and others' false statements and omissions and the artificial inflation of Providian stock caused thereby and sold 10,000 shares of Providian stock at artificially inflated prices, reaping illegal insider trading proceeds of nearly $500,000.

169.    On the following date during the Class Period, Defendant Rowe sold shares of Providian stock, thereby breaching his fiduciary duty to avoid conflicts of interest:

| Date | Transaction | Shares | Price Per Share | Proceeds |
|------|-------------|--------|-----------------|----------|
| 08/06/2001 | Sale | 10,000 | $49.30 | $    493,000.00 |
| **TOTAL SOLD** | | **10,000** | | **$    493,000.00** |

## VIII. BREACHES OF FIDUCIARY DUTY

170.    ERISA section 404(a)(1)(A) (29 U.S.C. § 1104(a)(1)(A)) imposes on a plan fiduciary a duty of loyalty--that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and...for the exclusive purpose of...providing benefits to participants and its beneficiaries...." Section 404(a)(1)(B) (29 U.S.C. § 1104(a)(1)(B)) also imposes on a plan fiduciary a duty of prudence--that is, a duty to "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and...with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man, acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims...."

## A.    Defendants Breached Their Duty to Disclose and Inform

171.    A plan fiduciary's duties of loyalty and prudence include a duty to disclose and inform. This duty entails: 1) a negative duty not to misinform; 2) an affirmative duty to inform when the fiduciary knows or should know that silence might be harmful; and 3) a duty to convey

1   complete and accurate information material to the circumstances of participants and

2   beneficiaries. This duty recognizes the disparity that may exist, and in this case did exist,

3   between the training and knowledge of the fiduciaries, on the one hand, and the participants and

4   beneficiaries, on the other. In a plan with various funds available for investment, this duty to

5   inform and disclose also includes: 1) the duty to impart to plan participants material information

6   of which the fiduciary has or should have knowledge that is sufficient to apprise the average plan

7   participant of the risks associated with investing in any particular fund; and 2) the duty not to

8   make material misrepresentations.

9       172.   By no later than the commencement of the Class Period, Defendants breached

10  their fiduciary duties to disclose and inform with respect to the Plan's use of employer stock as a

11  plan investment. During the Class Period, and before, any investment in employer stock in the

12  Plan was an undiversified investment in a single company's stock. As a result, any such

13  investment carried with it an inherently high degree of risk. These inherent risks made

14  Defendants' duty to provide complete and accurate information about investing in company

15  stock even more important than would otherwise be the case. Rather than providing complete

16  and accurate information to the Plan participants regarding the risks of investing in company

17  stock in the Plan, Defendants did the opposite.

18      173.   Quite aside from Providian's misconduct described above, the Defendants

19  breached their duties to participants by consistently misrepresenting the nature and magnitude of

20  the risk of a single stock as a retirement investment.

21      174.   For example, under the heading "Investment Choices," the Summary Plan

22  Description ("SPD") dated March 6, 2001, states that "Your Company matching contributions

23  will automatically be invested in the Providian Stock Fund. The Providian Stock fund invests

24  solely in Providian Financial common stock. If you invest in the Providian Stock Fund...." Doc

25  No. PRO-00101. By linking the fact that the match is in company stock with the availability of a

26  company stock option for participants, the SPD makes use of the "endorsement effect," well

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 53

1   known in the academic literature on 401(k) plans.  In truth, the fact that a significant portion of

2   the participant's savings are locked up in Company stock in the match is a reason not to invest

3   still further in that stock.  By linking the two, the SPD suggests that the sponsor is "endorsing"

4   the Company's stock as an appropriate investment for the employee's own contribution as well.

5          175.    Likewise, under the heading "Know Your Risk Tolerance," the SPD states:

6   "More aggressive investments are subject to periodic ups and downs but generally provide

7   higher returns over the long term."  Even as a general matter this is misleading; it is flatly false

8   with respect to the single largest "aggressive" investment in the Plan, namely Company stock.

9   Such an investment does not "generally provide higher returns over the long term" than a fund of

10  comparable diversified investments.

11         176.    Likewise, the SPD says that "Because the Providian Stock Fund is not a

12  diversified fund, it is generally more risky and volatile than a stock fund that is invested in many

13  different companies.  The Providian Stock Fund can experience substantial price fluctuations

14  over short term periods which may lead to loss of invested principal."  Doc No. PRO-00101

15  (emphasis added).  A single stock "fund" is not "generally" more risky and volatile; it is, for any

16  practical purpose, always more risky and volatile than a diversified fund.  Moreover, the second

17  sentence suggests that as long as the participants are investing for the long term, they need not be

18  concerned about the "substantial price fluctuations."  This is false.  A single stock experiences

19  such price fluctuations over the long term as well as the short term, and the risks posed by

20  significant investment in a single stock do not decrease over time.

21         177.    Likewise, the SPD refers several times to the "18 investment fund choices" as

22  though the Company stock fund is another typical investment "fund."  It is not a "fund" in the

23  ordinary sense at all.  It is simply the means to invest in a single stock.

24         178.    Likewise, the SPD says that "Generally, the more time you have to save and

25  invest, the more risk you can take because you can take advantage of the higher returns that are

26  possible with long-term investments in stocks."  Doc No. PRO-00100.  This is completely

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 54

1    misleading as to a single-stock fund.  The major risk bearing on such an investment, that it is an

2    investment not only in a single industry, but in a single firm, does not go down over time; it goes

3    up.

4           179.    Likewise, the SPD says that "Each of the investment funds offered has been

5    established for a specific investment objective:  to provide current income, future growth, or a

6    combination of income and growth."  Doc No. PRO-00100.  This is not true at all for the

7    Company stock "fund."  It was not established for a "specific investment objective" at all.  It was

8    established simply as the vehicle for investment in Company stock.

9           180.    In these and many other ways, the carefully drafted materials provided to Plan

10   participants explicitly and implicitly underestimated the risk of single stock investments, misled

11   participants about the nature of that risk, and suggested that a single stock investment was an

12   appropriate retirement investment strategy.

13          181.    In addition, neither in the Plan materials nor anywhere else did the Defendants

14   disclose the specific risks of Providian stock in view of the nature of Providian's business and

15   the misconduct described above.  Instead, they withheld and concealed material information

16   during the Class Period, and before, and actively misled the participants of the Plan about the

17   appropriateness of investing in Providian stock, about Providian's earnings prospects and

18   business condition, and about the accuracy of Providian's financial statements and other public

19   disclosure documents, and thereby encouraged Plan participants to continue to make and to

20   maintain substantial investments in Company stock in the Plan.

21   **B.    Defendants Breached Their Duty to Monitor Providian Stock and Ensure That It
            Was a Prudent Investment for the Plans**

22

23          182.    A fiduciary's duties of loyalty and prudence entail a duty to conduct an

     independent investigation into, and continually to monitor, the merits of all the investment

24
     alternatives in the Plan, including employer securities, to ensure that each investment is a

25
     suitable option for the plan.  Defendants breached this duty of investigation and monitoring with

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 55

1   respect to Company stock.  By no later than the beginning of the Class Period, Defendants could

2   not have reasonably made a determination that Company stock was a suitable investment for the

3   Plan, either for a participant's discretionary account or for the match.

4         183.   The Plan document specifically provides that the match will be invested in

5   Providian common stock.  See Providian Financial Corporation 401(k) Plan (as amended and

6   restated effective January 1, 1997), § 3.5, Doc No. PRO-00209.  However, the Defendants, as

7   ERISA fiduciaries, had the obligation to monitor the continued prudence of allowing the Plan

8   sponsor (Providian) to do so and to inform the plan sponsor that it could no longer match in

9   Company stock if Providian stock became an imprudent investment option.  See ERISA

10  § 404(a)(1)(D), 29 U.S.C. § 1104(a)(1)(D) (fiduciary "shall discharge his duties with respect to a

11  plan solely in the interest of the participants and beneficiaries and -- …in accordance with the

12  documents and instruments governing the plan insofar as such documents and instruments are

13  consistent with the provisions of this title and title IV") (emphasis added).  Additionally, as

14  stated previously, Company matches could not be re-directed.  Doc No. PRO-00099.

15        184.   As detailed above, the Defendants breached the fiduciary duties they owed

16  Plaintiffs by: (i) allowing and encouraging Plan participants to direct the Plan's fiduciaries to

17  purchase Providian stock and have such stock allocated to their individual accounts in exchange

18  for monies participants contributed to the Plan as deductions from their salaries; (ii) inducing

19  Plan participants to direct the Plan's fiduciaries to purchase Providian stock and have such stock

20  allocated to their individual accounts in exchange for monies contributed to the Plan by

21  participants; (iii) causing and allowing the Plan to purchase or accept Providian's matching

22  contributions to the Plan in the form of Providian stock; (iv) imposing and maintaining

23  restrictions on the ability of the participants to direct the Plan's fiduciaries to transfer Plan assets

24  out of Providian stock; and (v) inducing Plan participants to direct or allow the Plan's fiduciaries

25  to maintain the Plans' investments in Providian stock – all at a time when Defendants knew or

26  should have known that Providian stock was not a prudent investment option.

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 56

1    185.    Each Defendant knowingly participated in these fiduciary breaches of its co-

2    fiduciaries, enabled its co-fiduciaries to commit such fiduciary breaches by its own failure to

3    comply with the provisions of ERISA section 404(a), 29 U.S.C. § 1104(a), and had knowledge of

4    the breaches of its co-fiduciaries and failed to make reasonable efforts to remedy such breaches.

5    **C.    Defendants Breached Their Duty to Avoid Conflicts of Interest**

6    186.    The fiduciary duty of loyalty also entails a duty to avoid conflicts of interest and

7    to resolve them promptly when they occur.  A fiduciary must always administer a plan with an

8    "eye single" to the interests of the participants and beneficiaries, regardless of the interests of the

9    fiduciaries themselves or the plan sponsor.

10    187.    Defendants, each of which is either Providian itself or a Providian officer,

11    employee, or director, breached their duty to avoid conflicts of interest and to promptly resolve

12    them when they occur by continuing to allow Company stock as a Plan investment during the

13    Class Period, by: (i) failing to engage independent fiduciaries or consultants who could make

14    independent judgments concerning the Plan's investment in Company stock and who could

15    provide information to participants and beneficiaries concerning Company stock; and (ii) failing

16    to take whatever steps were necessary to ensure that the fiduciary of the Plan did not suffer from

17    a conflict of interest, including the notification by the Department of Labor of the questionable

18    transactions which made employer stock an unsuitable investment for the Plan.

19    188.    Additionally, Defendants breached their fiduciary duty to avoid conflicts of

20    interest by placing their personal gains before the interests of the Plan participants, to whom they

21    owed fiduciary duties.  For example, Defendants Mahta, Alverez, and Rowe breached their duty

22    to avoid conflicts of interest through the "Insider Trading" transactions described above.

23    189.    Defendants had, as their ultimate objective in conducting the affairs of Providian

24    and related enterprises, their own personal enrichment above all else.  To accomplish this

25    objective, they utilized every device possible to make Providian look successful to the public and

26    to Providian's employees, while they looted the Company at every opportunity.  Employee

1   retirement funds were an integral part of their illegal conduct.  Defendants viewed the retirement

2   funds as a vehicle of opportunity to further enrich themselves.  By providing employees with

3   compensation in the form of inflated stock, Defendants were able to keep employees content, and

4   avoid having to use cash to do so.  This made available for their use, hundreds of millions in cash

5   that Defendants could then use for their own illicit purposes.  The retirement plan became and

6   was an integral part of the Defendants' illegal conduct as described above.

7   **D.    Providian and the Human Resources Committee Defendants Breached Their Duty**
        **to Monitor the Plan's Investing Fiduciaries and/or Breached Their Duty to Disclose**
8       **to the Investing Fiduciaries Material Facts Concerning Providian's Financial**
        **Condition.**

9          190.    At all relevant times, Providian and the Human Resources Committee Defendants

10  acted as fiduciaries with respect to the Plan to the extent that they were charged with, responsible

11  for, and/or otherwise assumed, the duty of selecting, monitoring, and, when and if necessary,

12  removing other Plan fiduciaries, including but not limited to the Members of the Plans' Advisory

13  Committee.  Included in these Defendants' duty to monitor the Plans' other fiduciaries was the

14  duty to monitor the manner in which those fiduciaries were investing the Plans' assets.

15         191.    As fiduciaries, and knowing that the investing fiduciaries (including but not

16  limited to the members of the Advisory Committee) were investing and contemplating

17  continuing to invest Plan assets in Providian stock, these Defendants also had an affirmative duty

18  to disclose to the investing fiduciaries such material facts about the financial condition of the

19  Company that these Defendants knew or should have known the investing fiduciaries needed in

20  order to make sufficiently-informed decisions, based on accurate information, concerning those

21  investments.

22         192.    At all relevant times, each Defendant in this Count also was, and acted as, a

23  co-fiduciary of the other Defendants and the other Plan fiduciaries within the meaning of ERISA

24  section 405, 29 U.S.C. § 1105.

25

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 58

193.    The Defendants in this Count breached the fiduciary duties and co-fiduciary duties they owed Plaintiffs by:  (i) appointing fiduciaries to manage Plan assets who these Defendants knew or should have known were not qualified to loyally and prudently manage the Plans' assets; (ii) failing to adequately monitor the investing fiduciaries' investment of Plan assets; (iii) failing to adequately monitor the Plans' other fiduciaries' implementation of the terms of the Plan, including but not limited to the investment of Plan assets; (iv) failing to disclose to the investing fiduciaries material facts concerning the financial condition of Providian that they knew or should have known were material to loyal and prudent investment decisions concerning the use of Providian stock in the Plan and/or with respect to the implementation of the terms of the Plan; (v) failing to remove fiduciaries who they knew or should have known were not qualified to loyally and prudently manage the Plan's assets; (vi) knowingly participating in the investing fiduciaries' breaches by accepting the benefits of those breaches, both personally and on behalf of the Company, knowing of those breaches; (vii) knowingly undertaking to conceal acts and omissions of those fiduciaries, knowing they constituted fiduciary breaches; (viii) failing to remedy those fiduciaries' breaches, having knowledge of them.

194.    But for these breaches of fiduciary duty, the Plan's assets would not have been invested in Providian stock but are presumed to have been invested in the most profitable alternative investment available to the Plan.

## IX. LOSSES

195.    The Plan suffered a loss, and Plaintiffs and the other Class members suffered losses in their accounts at the Plan level, and were consequently damaged, because substantial assets in the Plan were invested in Company stock during the Class Period in violation of Defendants' fiduciary duties.  As of December 31, 1998, about $41 million of $100 million, or approximately 41% of the assets of the Plan, were in Company stock.  Upon information and belief, by the beginning of the Class Period, the percentage was much higher.

1    196.    As fiduciaries, Defendants were responsible for the prudence of investments in

2    the Plan during the Class Period unless participants in the Plan themselves exercised effective

3    and informed control over the assets in the Plan in its individual accounts pursuant to ERISA

4    section 404(c), 29 U.S.C. § 1104(c) and the regulations promulgated under it.  In order to qualify

5    as a section 404(c) plan, a plan must provide plan participants with a broad range of diversified

6    investment options, liberal opportunities to transfer assets among allocations, and sufficient

7    information to make sound investment decisions.  29 C.F.R. § 2550.404c.  Those provisions

8    were not complied with here; instead of taking the necessary steps to ensure effective participant

9    control by complete and accurate disclosure and regulatory compliance, Defendants did exactly

10   the opposite.  As a consequence, participants in the Plan did not control the Plan assets that were

11   invested in Company stock, and Defendants remained entirely responsible for ensuring that such

12   investments were and remained prudent.  Defendants' liability to the Plan for losses stemming

13   from imprudent Plan investments in company stock is therefore established upon proof that such

14   investments were or became imprudent and resulted in losses in the value of the assets in the

15   Plan during the Class Period, without regard to whether or not the participants relied upon

16   Defendants' statements, acts, or omissions.

17   197.    The Plan also suffered a loss, and Plaintiffs and the other Class members suffered

18   losses in their accounts at the Plan level, and were consequently damaged, by Defendants'

19   above-described conduct during the Class Period, and before, because Defendants' materially

20   deceptive statements, acts, and omissions were fundamentally designed to deceive Plaintiffs and

21   the other Class members about the prudence of making and maintaining investments in Company

22   stock.  Where a breach of fiduciary duty consists of, or includes, misrepresentations and

23   omissions material to a decision by a reasonable participant that results in harm to the

24   participant, the participant is presumed as a matter of law to have relied upon such

25   misrepresentations and omissions to his or her detriment.  Here, Defendants' above-described

26   statements, acts, and omissions constituted misrepresentations and omissions that were

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 60

1   fundamentally deceptive concerning the prudence of investments in Company stock and were

2   material to any reasonable person's decision about whether or not to invest or maintain any part

3   of its plan assets in Company stock during the Class Period.  Plaintiffs and the other Class

4   members are therefore presumed to have relied to their detriment on Defendants' deceptive

5   statements, acts, and omissions.

6          198.    Plaintiffs further contend that the Plan suffered a loss, and Plaintiffs and the other

7   Class members suffered losses in their accounts at the Plan level, and were consequently

8   damaged, by Defendants' above-described conduct during the Class Period, and before, because

9   that conduct fundamentally deceived Plaintiffs and the other Class members about the prudence

10  of making and maintaining investments in Company stock, and that, in making and maintaining

11  investments in Company stock, Plaintiffs and the other Class members relied to their detriment

12  upon Providian's materially deceptive statements, acts, and omissions.

13                 **X.  REMEDY FOR BREACHES OF FIDUCIARY DUTY**

14         199.    ERISA Section 502 (a) (2) (29 U.S.C. § 1132(a)(2)) authorizes a plan participant

15  to bring a civil action for appropriate relief under section 409 (29 U.S.C. § 1109).  Section 409

16  requires "any person who is a fiduciary...who breaches any of the...duties imposed upon

17  fiduciaries...to make good to such plan any losses to the plan...."  Section 409 also authorizes

18  "such other equitable or remedial relief as the court may deem appropriate...."  ERISA

19  Section 502 (a) (3) (29 U.S.C. § 1132(a)(3)) authorizes a plan participant to bring a civil action

20  for breach of fiduciary duty for "appropriate equitable relief."

21         200.    With respect to the calculation of the losses to a plan, breaches of fiduciary duty

22  result in a presumption that, but for the breaches of fiduciary duty, the participants and

23  beneficiaries in the plan would not have made or maintained their investments in the challenged

24  investment and, where alternative investments were available, that the investments made or

25  maintained in the challenged investment would have instead been made in the most profitable

26

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 61

1   alternative investment available.  In this way, the remedy restores the values of the plan's assets

2   to what they would have been if the plan had been properly administered.

3          201.    Plaintiffs and the Class are therefore entitled to relief from Defendants in the form

4   of: 1) a monetary payment to the Plan to make good to the Plan the losses to the Plan resulting

5   from the breaches of fiduciary duties alleged above in an amount to be proven at trial based on

6   the principles described above, as required by ERISA § 409(a) (29 U.S.C. § 1109(a));

7   2) injunctive and other appropriate equitable relief to remedy the breaches alleged above, as

8   provided by ERISA Sections 409(a) and 502(a)(2)&(3) (29 U.S.C. §§ 1109(a) and

9   1132(a)(2)&(3)); 3) reasonable attorney fees and expenses as provided by ERISA Section 502(g)

10  (29 U.S.C. § 1132(g)), the common fund doctrine, and other applicable law; 4) taxable costs; and

11  5) interest on some or all of these amounts as provided by law.

## XI. PRAYER

13         In view of all of this, Plaintiffs and the Class pray for judgment against Defendants for a

14  monetary payment to the Plan, injunctive and other appropriate equitable relief, reasonable

15  attorney fees and expenses, taxable costs, interest, and any other relief the Court deems just.

16         DATED this 14th day of June, 2002.

Lynn Lincoln Sarko
**KELLER ROHRBACK, L.L.P.**
1201 Third Avenue, Suite 3200
Seattle, WA  98101-3052

Jane B. Stranch
**BRANSTETTER, KILGORE, STRANCH & JENNINGS**
227 Second Avenue, North, 4th Floor
Nashville, Tennessee  37201-1631

*Co-Lead Counsel for Plaintiffs*

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 62

Ronald Lovitt or Thomas Hannan
**LOVITT & HANNAN, INC.**
900 Front Street, Suite 300
San Francisco, CA  94111

Robert A. Goodin or Wayne T. Lamprey
**GOODIN, MACBRIDE, SQUERI,
RITCHIE & DAY, LLP**
505 Sansome Street, 9th Floor
San Francisco, California  94111

*Co-Liaison Counsel for ERISA Plaintiffs*

Ron Kilgard
**DALTON GOTTO SAMSON & KILGARD,
PLC**
3101 North Central Ave., Suite 900
Phoenix, AZ  85012-2600

Todd Collins
**BERGER & MONTAGUE, PC**
1622 Locust Street
Philadelphia, PA  19103

Kirk Hulett
**HULETT HARPER LLP**
550 West C Street, Suite 1770
San Diego, CA  92101

Joe Whatley
**WHATLEY DRAKE LLC**
2323 Second Avenue North
Birmingham, AL  35202

Robert Scott Dreher
**JEFFREY & DREHER, LLP**
225 Broadway, 19th Floor
San Diego, CA  92101

George C. Barrett
**BARRETT, JOHNSTON & PARSLEY**
217 Second Avenue, North
Nashville, TN  37201-2202

Reginald Terrell
**LAW OFFICES OF JOHN BURRIS**
223 25th Street
Richmond, CA  94804

Additional Counsel for Plaintiffs

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 63

**PROOF OF SERVICE**

I, Sarah Starcevich, declare under penalty of perjury as follows:

I am a resident of the United States, over the age of eighteen (18) years, not a party to the within action, and competent to testify as to the matters herein set forth.

On June 14, 2002, I served a copy of:

- Consolidated Class Action Complaint; and
- Proof of Service

in the within action on all parties listed on the attached Service List via electronically and via facsimile pursuant to the Court's May 15, 2002 Order.

Executed on June 14, 2002, at Seattle Washington.


_____
Sarah Starcevich

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 64

**SERVICE LIST**

1

Ms. Jane B. Stranch
**Branstetter, Kilgore, Stranch & Jennings**
Lead Counsel for the ERISA Plaintiffs
Gbs@branstetterlaw.com
Fax:  (615) 255-5419

Mr. Robert A. Goodin
Mr. Wayne T. Lamprey
**Goodin, MacBride, Squeri, Ritchie & Day, LLP**
Liaison Counsel for ERISA Plaintiffs
Rgoodin@gmssr.com
Wlamprey@gmssr.com
Ahartman@gmssr.com
Fax:  (415) 398-4321

Mr. Ronald Lovitt
Mr. Thomas Hannan
**Lovitt & Hannon, Inc.**
Liaison Counsel for ERISA Plaintiffs
Hannon@lh-sf.com
Lovitt@lh-sf.com
Davies@lh-sf.com
Fax: (415) 362-7528

Mr. Joseph McMonigle
**Long & Levit, LLP**
Liaison Counsel for ERISA Defendants
Jmcmonigle@longlevit.com
Fax:  (415) 397-6392

Mr. H. Douglas Hinson
Mr. Gregory C. Braden
**Alston & Bird, LLP**
Lead Counsel for ERISA Defendants
Gbraden@alston.com
Fax: (404) 881-7777

Ms. Lauren E. Wagner
**Chitwood & Harley**
Lead Counsel for the Securities Plaintiffs
Lew@classlaw.com
Mdc@classlaw.com

Paul F. Bennett
**Gold Bennett Cera & Sidener**
Liaison Counsel for the Securities Plaintiffs
Pfb@gbcsf.com
Cgw@gbcsf.com
Ggiblin@gbcsf.com

Mia Mazza
**Morrison & Foerster, LLP**
Lead Counsel for the Securities Defendants
Mmazza@mofo.com
Mgoldman@mofo.com
Jeth@mofo.com
Cpotter@mofo.com

CONSOLIDATED CLASS ACTION ERISA COMPLAINT
Case No. C 01-5027 CRB; Page 65

N:\CLIENTS\25535\1\PLEADINGS\CONSOLIDATED.COMPLAINT.FINAL.06142002.DOC